A03A1822. NASH v. OHIO NATIONAL LIFE INSURANCE
COMPANY.
A03A1823. NASH v. SLEDGE.
(597 SE2d 512)

SMITH, Chief Judge.

This appeal arises out of the trial court's order granting summary judgment to several defendants in an action brought by H. Thomas Nash. Nash filed a complaint on December 5, 2000, naming Ohio National Life Insurance Company, Ohio National Life Assurance Corporation (collectively "Ohio National" unless otherwise noted), and Frank K. Sledge as defendants.[1] He alleged that Sledge had sold him an insurance policy written through Ohio National and that Sledge had represented to him that the policy was a whole life insurance policy, when instead it was a variable life insurance policy. Nash sought reimbursement for all amounts he paid to the defendants, plus interest, compensatory and punitive damages, and attorney fees. He later amended the complaint to allege fraud and deceit, negligent misrepresentation of fact, breach of contract and fiduciary duties, and unfair trade practices. As stated by the trial court, the crux of Nash's amended complaint is that Sledge fraudulently induced him to purchase the policy by misrepresenting to him that the policy would be fully "paid up" after five annual premium payments of $25,284. The trial court entered summary judgment in favor of all defendants, concluding among other things that Nash's claims were barred by the applicable statutes of limitation. In Case No. A03A1822, Nash appeals from the trial court's order granting summary judgment to Ohio National, and in Case No. A03A1823, he appeals from the order granting summary judgment in favor of Sledge. For the reasons that follow, we agree with the trial court's conclusions. We therefore affirm.

Construed in favor of Nash as the nonmovant on motion for summary judgment, the record shows that Sledge completed an application for life insurance on Nash's behalf.[2] Nash contends that during the course of their conversations about his insurance needs, Sledge represented to him that the policy for which he was applying would be fully "paid up" in five years. During these conversations, Sledge presented Nash with an "illustration" dated October 23, 1986,

---

[1] Multiple Benefits Services, Inc. also was named as a defendant but was later voluntarily dismissed.

[2] We note that "Nash is an accomplished businessman," as pointed out by Ohio National. Since 1955, he has operated a car dealership in the Atlanta area, known as "Nash Chevrolet." At the time of Nash's deposition in June 2001, the franchise employed more than 150 people. In connection with his business, at various times Nash was licensed in the State of Georgia to sell credit life insurance, in addition to property and casualty insurance.

which contemplated five annual premium payments of $25,284, with a death benefit of $400,000. The illustration recited, however, that it was a proposal and that the "current values" on which the projected payments were made "are illustrative only and are not guaranteed." It further recited that "[t]he values labeled 'current' are neither guarantees nor estimates of the future and are subject to annual change." After Nash applied for the policy, he received an adverse health rating, which substantially increased Nash's cost of insurance. Sledge testified that he advised Nash that he would have to pay seven or eight more premiums, due to the adverse rating. Nash testified that Sledge told him he would have to pay one more annual premium.

Nash purchased the policy, which was issued in April 1987, and Nash Chevrolet made seven annual premium payments between 1987 and 1994. Premium payments ceased until March 1998, when one additional premium of $23,125.92 was paid. The manager for universal life administration for Ohio National testified that as a result of the premiums paid from 1987 through 1994, Nash was covered by the policy until 1998, but that as a result of the cessation of payments after March 1994, "the accumulated cash value in the policy began to decline, as that cash value funded the continuing costs of insurance charges necessary to keep the policy in force. The final premium payment in March of 1998 kept the policy in force through October of 1998." No more premium payments were made, and Nash's policy lapsed in November 1998. Nash brought this action in December 2000, alleging among other things that Sledge fraudulently or negligently represented to him that the policy would be fully "paid up" in five years.

Ohio National and Sledge moved for summary judgment. The trial court granted the motions, concluding among other things that as a result of Nash's "manifest lack of due diligence" in discovering any fraud, the applicable statutes of limitation were not tolled and that all claims were time-barred. Nash appeals.

## Case No. A03A1822

1. We first address Nash's contention that factual issues exist as to whether he exercised due diligence in discovering Sledge's alleged fraud. The statute of limitation for claims alleging fraud and misrepresentation is four years. OCGA § 9-3-31; *Paul v. Destito*, 250 Ga. App. 631, 636 (2) (550 SE2d 739) (2001). The limitation period can be tolled, however, under OCGA § 9-3-96, which provides: "If the defendant or those under whom he claims are guilty of a fraud by which the plaintiff has been debarred or deterred from bringing an action, the period of limitation shall run only from the time of the plaintiff's

discovery of the fraud." When, as here, the underlying cause of action is one alleging actual fraud, the statute of limitation "is tolled until such fraud is discovered, or could have been discovered by the exercise of ordinary care and diligence." (Punctuation and footnote omitted.) *Hunter, Maclean, Exley & Dunn, P.C. v. Frame*, 269 Ga. 844, 847 (507 SE2d 411) (1998). Although issues concerning a plaintiff's diligence in discovering fraud usually must be resolved by the trier of fact, this "is not always the case. A party may fail to exercise due diligence as a matter of law." (Citations and punctuation omitted.) *McClung Surveying v. Worl*, 247 Ga. App. 322, 324 (1) (541 SE2d 703) (2000). Finally, it is the plaintiff's burden to show the existence of facts that would toll the statute of limitation. *Edmonds v. Bates*, 178 Ga. App. 69, 72 (342 SE2d 476) (1986).

Assuming, without deciding, that Sledge misrepresented to Nash that his policy would be fully "paid up" in five years, several facts lead us to the conclusion that Nash failed to exercise due diligence in discovering this misrepresentation.

Nash acknowledged during his deposition that at the time he applied for the Ohio National policy, he understood that an insurance policy could "get to the point where you don't have to pay any more premiums" when the policy "has developed a sizeable enough cash value to fund the premiums." When questioned by Ohio National's counsel, he agreed that at some point, "the cash value would generate its own return to some extent and that could be used to pay premium[s]." He also acknowledged the fact that the amount of cash value could be diminished to pay the premiums. According to Nash, it was his understanding that "the internal rate of return on the capital value of the policy was fixed and unchanging, no matter what else was going on in the economy." He agreed that he never knew what the rate of return was on the capital value of the policy and that he did not ever "rely upon any representation as to what the future return on the policy would be." Nash never read the policy. He testified that he had never even seen it.

Although Nash did not read his policy and perhaps did not have a copy of it, documentation that *was* in Nash's possession is inconsistent with Nash's alleged belief that he was purchasing a fixed-interest policy. As mentioned above, the October 1986 illustration, which had been in Nash's desk since he received it in 1986, recites that "[c]urrent interest and cost of insurance rates are subject to change" and that "[t]he current values presented in this proposal are illustrative only and are not guaranteed." The illustration, which was prepared before Nash received an adverse health rating, recites that it is based on several assumptions, one of which is the assumption that "[c]urrent non-guaranteed cost of insurance and interest rates remain unchanged." It is undisputed that Nash's cost of insurance did

increase substantially, however, as a result of the rating that issued after his physical examination. As found by the trial court,

> [T]he document which was supposedly the occasion for the oral representation that the policy would be "paid up" after five annual premium payments, contradicts that very representation. Moreover, this illustration accompanied the application and predated the adverse rating of the policy based on Mr. Nash's health conditions, an adverse rating of which Mr. Nash was aware.

Other documents Nash received from Ohio National also are inconsistent with Nash's belief that after five years, his premium payments would be funded from the rate of return on the cash value of his policy as a result of fixed interest rates. Nash received annual statements from Ohio National demonstrating the features of the policy. One statement, received May 23, 1988, shows variations in the interest rate that had been applied to the policy the previous year. It further recites the "current rate for new premiums" but notes that this rate was guaranteed for only one month. Other statements contain similar information. Nash made no attempt to read or understand these statements, and he "made no attempt to investigate to find out what the actual guaranteed interest rate was on this policy for its internal rate of return."

In addition to the documents in Nash's possession, Nash's own accountant advised him of the fact that the policy would perform contrary to Sledge's alleged misrepresentations. In 1992, the accountant reviewed Sledge's file and concluded "that the policy may not be worth what the illustration indicated and that there may be additional premiums necessary." After reviewing Sledge's file, the accountant "discussed with Tom [Nash] that this policy was based on a projection of interest rates and that it was not a guarantee; it was simply a projection. And that this illustration may or may not be fact." He testified that he told Nash he believed "that there will be additional payments necessary after the seventh year." This witness also acknowledged that the illustration showed "on its face . . . that it would not be reasonable to expect this policy to last indefinitely, based on seven years of payments."

If the documents in Nash's possession did not place him on notice of Sledge's alleged misrepresentations concerning the number of annual premiums needed to keep the policy in force, the advice of Nash's own accountant did. Even giving Nash the benefit of every possible doubt, by 1992 at the latest Nash had received direct information that conflicted with Sledge's representation that premium payments would cease after five years. At that time, he was

placed on notice that Sledge's alleged representations may have been false. See *McClung,* supra, 247 Ga. App. at 325 (1). We agree with the trial court's conclusion that Nash

> received substantial information which directly conflicted with the alleged representations of Mr. Sledge upon which he allegedly relied. Without regard to whether such reliance was appropriate originally (notwithstanding the conflict between the policy illustration and the representation) and without regard to whether earlier action was required after the lapse of the five-year period during which the policy was to have been paid up, Nash was clearly put on notice by his accountant that Mr. Sledge's representations were not correct, and the fact that he appreciated this fact is confirmed by his retention of counsel thereafter.

Nash was a sophisticated businessman who previously had held an insurance license. Given the documents in his possession, in addition to the advice of his own accountant in 1992, we conclude that the trial court correctly found Nash to have exhibited a "manifest lack of due diligence" in discovering the misrepresentations. The complaint was filed in December 2000, more than fourteen years after Sledge allegedly misrepresented to him that premiums would cease after a fixed number of payments, more than thirteen years after the policy was issued, and more than eight years after Nash was notified of the possible inaccuracy of Sledge's representations. The four-year statute of limitation had expired, and Ohio National was entitled to summary judgment on the fraud claim.

Nash argues that his burden of examining his insurance policy was relieved because Sledge acted as his agent and held himself out as an expert. The courts of this State have held that an insured may not always be charged with the duty of carefully examining his or her insurance policy. This situation arises if an agent acts in a fiduciary relationship with his insured and "holds himself out as an expert in the field of insurance and performs expert services on behalf of the insured under circumstances in which the insured must rely upon the expertise of the agent to identify and procure the correct amount or type of insurance." (Citations and punctuation omitted.) *Atlanta Women's Club v. Washburne,* 207 Ga. App. 3, 4 (427 SE2d 18) (1992). When this occurs,

> the insured is relieved of the responsibility to minutely examine the policy to determine if the required coverage was included within its terms. Even in these circumstances, however, the insured is not relieved of all responsibility to

examine the policy. The duty to read remains where an examination of the policy would have made it readily apparent that the coverage contracted for was not issued.

(Citations and punctuation omitted.) Id. at 4-5. See also *Wright Body Works v. Columbus Interstate Ins. Agency*, 233 Ga. 268 (210 SE2d 801) (1974).

Assuming, without deciding, that Sledge held himself out to Nash as an expert, the rule discussed in *Atlanta Women's Club* and *Wright Body Works* is not controlling. As discussed above, the documents in Nash's possession raised some question as to whether Nash's policy would be "paid up" in five years. Second, unlike those cases, this is not a case in which an agent or broker negligently failed to procure coverage, which resulted in a loss to the insured. Third, and most importantly, even assuming Nash was relieved of the duty to carefully read his policy, at least by 1992, when his own accountant advised him that additional premiums likely were required, Nash should have been aware that Sledge may have misrepresented the number of premiums due.

Nash also argues that Sledge "thwarted" his "diligent investigation, such that [he] could not reasonably have discovered the fraud." He testified that when he received billing statements from Ohio National, Sledge told him that no further payments were due.[3] Nash's accountant testified that Sledge stated to him that no premiums were due after Nash made seven annual payments. The accountant, however, "never really reached an agreement" with Sledge as to the accuracy of this statement, and the accountant advised Nash that more premium payments *would* be required. Even assuming Sledge told Nash that no further premiums were due, Nash had documents within his possession contradicting this information, and his own accountant had informed him that he would need to pay more premiums. He chose simply to ignore his own documentation, his own accountant's advice, and the repeated billing statements sent by Ohio National.

As found by the trial court, by 1996, Nash "had developed sufficient appreciation of the issues raised by . . . his accountant, and by his continued receipt of premium bills, that he referred the matter to his legal counsel." In September 1996 Nash's then attorney wrote to Sledge and advised him to cease communications personally with Nash and to address all communications to her. She testified by affidavit that she believed she simply was helping resolve a "billing

---

[3] Although he contends that Sledge sent him handwritten notes stating that he need not make any more payments, no such writing appears in the record.

problem." But as aptly found by the trial court, this " 'billing dispute' had to do with whether any additional premiums were due in order to maintain the policy in force. Thus the matter had risen to a level causing Mr. Nash to retain legal counsel to represent his interests adverse to Mr. Sledge." Nash has not shown how or why he was prevented from inquiring further into the matter between the time his accountant warned him of the alleged misrepresentation and the time he finally hired counsel to represent him. Although he argues that he requested a copy of the policy, the record shows that he did not make a written request to Ohio National for a replacement copy and that even after he received what he believed to be a replacement copy of the policy, he "didn't read it that much."

We find no merit in Nash's argument that even if he failed to exercise due diligence, genuine issues exist as to whether this failure was "excused based on the parties' confidential relationship." Sledge testified that he was "a career agent" and later a "general agent" for Ohio National. It is well settled that "there is no fiduciary relationship between the insured and the insurer or the insurer's agent. Furthermore, the expression of an opinion as to coverage does not work an estoppel — even against the agent who voiced it, or against his principal." (Citations and punctuation omitted.) *Fowler v. Prudential Property &c. Ins. Co.*, 214 Ga. App. 766, 767 (449 SE2d 157) (1994). Nash simply failed to exercise ordinary diligence in discovering Sledge's alleged fraud at least after 1992, when his accountant told him that further premiums were due. His complaint, filed in December 2000, fell well outside the four-year statute of limitation for fraud and negligent misrepresentation claims, and the trial court correctly granted summary judgment to Ohio National on these claims.

2. Nash also contends summary judgment was erroneously granted to Ohio National on his breach of contract claim. To the extent that Nash bases his breach of contract claim on Sledge's alleged representations that the policy would be "paid up" in five years, these oral representations were not binding on Ohio National. See *Fowler*, supra, 214 Ga. App. at 767. Furthermore, even if these alleged oral statements did bind Ohio National, and even if, as Nash argues, genuine issues exist as to the existence of the policy, as to whether Sledge failed to procure the policy he had contracted with Nash to obtain, and as to whether Ohio National breached the contract "by treating the policy as rated," any breach by Ohio National would have occurred no later than 1992 when it required payments beyond five years. The complaint in this case was filed eight years later, well beyond the six-year limitation period for breach of contract claims. For the same reasons discussed in Division 1, even if fraud occurred that might have tolled the statute of limitation, such

tolling ceased no later than 1992, when Nash received information from his accountant that the policy would not perform as predicted by Sledge. The trial court correctly concluded that Nash's contract claims were time-barred.

3. Given our conclusions that Nash's claims for fraud, negligent misrepresentation, and breach of contract are time-barred, we need not reach his remaining contentions.

### Case No. A03A1823

4. In his appeal from the trial court's order granting summary judgment to Sledge, Nash raises arguments nearly identical to those raised in his appeal from the order granting summary judgment to Ohio National. Just as the applicable statutes of limitation expired with respect to the claims against Ohio National, they expired with regard to the claims against Sledge. For the reasons discussed above, the trial court also correctly granted summary judgment to Sledge.

*Judgments affirmed. Ruffin, P. J., and Miller, J., concur.*

DECIDED MARCH 22, 2004.

*Friedman, Dever & Merlin, Hayes M. Dever, Patricia J. Duffy,* for appellant.

*Love, Willingham, Peters, Gilleland & Monyak, Allen S. Willingham, Michael T. Thornton,* for appellees.