A08A2014. ALL STAR, INC. v. FELLOWS et al.

(676 SE2d 808)

PHIPPS, Judge.

All Star, Inc. sued Shawn Fellows and David Awtrey, alleging they had committed tortious interference with business relations and conversion. At a trial, the court directed verdicts in the defendants' favor on the tortious interference claims, and the jury returned defense verdicts on the conversion claims. Thereupon, judgment was entered. On appeal,[1] All Star contests the directed verdicts and the admission of certain exhibits. For reasons that follow, we affirm.

1. All Star challenges the directed verdicts.

> To support a verdict for tortious interference with business relations the evidence must show the defendant (1) acted improperly and without privilege, (2) purposely and with malice with the intent to injure, (3) induced a third party or parties not to enter into or continue a business relationship with the plaintiff, and (4) for which the plaintiff suffered some financial injury.[2]

In addition, the "stranger" doctrine applies to a claim of tortious interference with business relations and is the same as that applicable to a claim of tortious interference with a contractual relation-

---

[1] This appeal is from a second trial concerning these parties. See generally *Fellows v. All Star, Inc.*, 272 Ga. App. 262 (612 SE2d 86) (2005) (determining that Awtrey and Fellows were entitled to directed verdicts on All Star's claims of breach of noncompete agreements, which were held unenforceable as too broad; recognizing that All Star had pursued other claims, some of which, "e.g., tortious interference with business relationships, fraud, and theft by conversion, could exist independent of the noncompete agreements"; and thus remanding the case).

[2] *Arford v. Blalock*, 199 Ga. App. 434, 440 (13) (405 SE2d 698) (1991) (citation and punctuation omitted), approved as a correct statement of the law, *Wilensky v. Blalock*, 262 Ga. 95, 96 (2) (414 SE2d 1) (1992).

ship.[3] Regarding the latter, the Supreme Court of Georgia has instructed:

> [T]he plaintiff must establish that the defendant is a "third party," i.e., a "stranger" to the contract with which the defendant allegedly interfered. One is not a stranger to the contract just because one is not a party to the contract, as it has been held that the alleged interferer is not a stranger to the contract and thus not liable for tortious interference where the alleged interferer was the agent for one of the parties to the contract of insurance (i.e., the underwriter), and all the purported acts of interference were done within the scope of the interferer's duties as agent.[4]

In its appellate brief, All Star summarizes the theory that underlay its claims of tortious interference with business relations:[5]

> The uncontroverted evidence at trial was that Appellees, prior to ending their employment/association with Appellant solicited customers of Appellant, and caused these customers ([three Alabama businesses]) to discontinue their relationship with Appellant, and, instead, to start doing business with a competing entity started by Appellees.

Accordingly, an essential element of each such claim was the existence of a business relationship.[6] Awtrey and Fellows moved for directed verdicts on grounds that All Star had failed to show in its case-in-chief, inter alia, the existence of a business relationship as alleged. In addition, Awtrey and Fellows argued that, even if such a relationship had been shown, All Star had failed to demonstrate that they were strangers to it.

A directed verdict is authorized only when "there is no conflict in the evidence as to any material issue and the evidence introduced, with all reasonable deductions therefrom, shall demand a particular verdict."[7] "[W]e review the trial court's grant of a directed verdict under the 'any evidence' standard, construing the evidence favorably

---

[3] *Atlanta Market Center Mgmt. Co. v. McLane*, 269 Ga. 604, 609 (2), n. 2 (503 SE2d 278) (1998).

[4] Id. at 608 (citations omitted).

[5] Neither opening statements nor closing arguments were transcribed in the record before us. In the pre-trial order, All Star states that Awtrey and Fellows "solicited customers of All Star and placed games with those customers, all to the detriment of All Star."

[6] See generally *Atlanta Market Center Mgmt. Co.*, supra.

[7] OCGA § 9-11-50 (a); see *Dyer v. Souther*, 272 Ga. 263, 265 (2) (528 SE2d 242) (2000).

to the nonmovant."[8]

All Star, a Georgia corporation, was engaged in the business of placing amusement games (or machines) in various Georgia locations, including bars, restaurants, and convenience stores. Anticipating that state legislation would soon outlaw All Star's business, the corporation's sole owner, Larry Simmons, sought to establish the same type of business in other states. Simmons discussed establishing such a business in Alabama with Awtrey and Fellows. Awtrey had formerly worked at All Star and was then living in Alabama. Fellows also had previously worked for All Star; he had served as vice-president of an association that lobbied to influence the anticipated Georgia legislation; and as of late 2000, he had been re-hired at All Star in a management capacity with responsibilities that included pursuing out-of-state opportunities. The three men orally agreed to operate a business together in Alabama.

In 2001, Simmons financed the start-up of D. R. Awtrey & Associates, Inc., d/b/a Alabama Amusements, which Awtrey incorporated in Alabama. The new corporation began obtaining amusement games from various sources. For example, it purchased approximately $40,000 to $50,000 of games from an unrelated company, Cadillac Games. In addition, Alabama Amusements purchased games from All Star, which had been manufactured by another of Simmons's corporations, Money Machines, Inc. There also was testimony that, with respect to Alabama Amusements acquiring games manufactured by Money Machines, "[m]ore often than not, they'd just take the games out of the warehouse," keeping track of them by a tagging system.

Initially, Awtrey was sole owner of Alabama Amusements and also served as its president. Because he lived in Alabama, his role was "the man on the ground running the operation," and his responsibilities included soliciting businesses for placement of games, placing the games in the procured customers' business locations, and collecting monies generated by those games. Awtrey understood that his compensation would include hourly wages, expenses, and commissions.

Fellows continued to work out of an office located in a building in Georgia, which housed offices for All Star, Alabama Amusements, and other corporations.[9] In addition to his work for All Star, Fellows handled various business matters for Alabama Amusements. He

---

[8] *Walls v. Moreland Altobelli Assocs.*, 290 Ga. App. 199 (659 SE2d 418) (2008) (citation omitted).

[9] Simmons owned corporations he had set up for similar operations in Texas and Arkansas, and these corporations also had offices in this same building.

understood that for his work on the latter, he would be compensated through commissions.

Thus, in accordance with their agreement, Awtrey obtained customers in Alabama. Amusement machines were brought into the customers' business locations. Awtrey serviced the accounts, collecting money that had been generated by the machines. Fellows, too, participated in setting up the Alabama operations and thereafter servicing the Alabama customers. In addition, another individual employed by All Star (not Fellows) occasionally serviced routes in Alabama, replacing game machines, collecting money, and taking the collected money to personnel at the office building in Georgia. While All Star provided this individual with a vehicle to service the Alabama routes, there was evidence that he was paid out of Alabama Amusements' revenue for his work in Alabama.

Awtrey withheld from the monies he collected the wages he had earned, as well as expenses he had incurred. There was evidence that the remaining money was deposited into Alabama Amusements' separate bank account at Regions Bank, on which only Awtrey, Fellows, and Simmons had check writing authority.

At regular intervals, Awtrey would fax to Fellows "collection sheets," upon which Awtrey had recorded the amount of money collected from each machine, as well as the location of each such machine. In addition, Awtrey provided to Fellows written accounts of his hours worked, activities performed, and expenses incurred. There was evidence that Fellows was responsible for seeing that Alabama Amusements' taxes and other expenses were paid out of that corporation's revenue.

All Star's chief finance officer testified that All Star's revenue was "shuffled." When asked what he meant by that term, he responded:

> At the time Georgia was doing really well, enabling us to, you know, save for — you know, to buy games for Alabama, to get supplies for Money Machines in order to build the games. So, you know, I'd have to pay this guy for something, this supplier for something. That's what I meant by shuffled.

Regarding All Star's health insurance plan, there was evidence that All Star added Awtrey to its list of covered individuals.

By early summer 2002, Awtrey was no longer Alabama Amusements' president, and Simmons wholly owned the corporation. Awtrey and Fellows had become dissatisfied because they were not paid commissions that they believed they had earned. They formed a separate company to engage in the same type of business as Alabama

Amusements. For the new company, they secured the business of three customers with which Awtrey had placed games. Awtrey and Fellows then removed or caused the removal of previously placed machines from those three premises. The two then procured amusement games from companies other than All Star and Money Machines and placed them in those three locations. And in early July 2002, they resigned from Simmons's corporations.

At trial, after All Star rested its case, the defense argued that All Star had failed to establish essential elements of its claim, including the existence of any business relationship as alleged. In addition, the defense argued that even if such a relationship had been shown, neither Awtrey nor Fellows was a stranger to it and consequently neither of the two could be held liable.

With respect to the lack of any business relationship argument, the defense asserted that All Star had failed to establish that *it* had a business relationship with any of the three allegedly stolen Alabama customers. The defense asserted that the evidence was undisputed that All Star and Alabama Amusements were separate corporations and that the three Alabama businesses at issue had been customers of the latter. In addition, the defense asserted that there was no evidence that the three Alabama businesses had the alleged business relationships with All Star. Referencing All Star's evidence that All Star and Alabama Amusements shared office space within the same building and that "employees of one company helped out with [the other company]," the defense accused All Star of essentially attempting to pierce its own corporate veil to claim another corporation's customers and thus make out its claim. The defense protested that All Star was estopped under principles akin to those expressed in OCGA § 14-5-4;[10] in addition, the defense cited rules of law set forth in *Yukon Partners v. Lodge Keeper Group*,[11] such as the rule that the mere existence of some unspecified affiliation is not sufficient to pierce the corporate veil.[12]

All Star's counsel responded, "[T]hat has been the argument since day one in this case." He added that the two corporate entities — All Star and Alabama Amusements — had not done a "particularly good job of remaining separate." Thus, he urged that a jury be allowed to "recognize that this operation in Alabama was acting as an agent or affiliate for All Star, Inc., in the state of Alabama," claiming "there's plenty of information that shows employees going

---

[10] "The existence of a corporation claiming a charter under color of law cannot be collaterally attacked by persons who have dealt with it as a corporation. Such persons are estopped from denying its corporate existence."

[11] 258 Ga. App. 1 (572 SE2d 647) (2002).

[12] See id. at 6.

back and forth, paperwork going back and forth, money going back and forth, trucks going back and forth, games going back and forth that would be sufficient for them to determine that while these two entities existed, that it is All Star."

After hearing extensive argument also on whether All Star had made the requisite showing under the "stranger" doctrine, the trial court denied the defendants' motions for directed verdict, rejecting these and their other grounds before recessing trial for the evening. The next morning, however, and with no mention on the record of any specific ground, the trial court announced, "I have decided to reverse my position with regard to the claim for tortious interference, and I will grant the directed verdict with regard to that claim." For reasons that follow, we find that the court's "reversal" was the correct ruling.

(a) *The Existence of a Business Relationship.* With no citation to the record,[13] All Star maintains in its appellate brief that it "operates under a different name, and, at times, through an affiliated corporation owned and controlled by [it] and or its President, Larry Simmons. This was the case of its operation in the state of Alabama." Notwithstanding this asserted premise, All Star presented no evidence that would have allowed for a finding of any alleged business relationship.

There was no evidence that All Star was authorized to do business in any state other than Georgia. It was uncontroverted that All Star's sole owner collaborated with Awtrey and Fellows to enter the amusement industry in Alabama. To that end, a company was incorporated in Alabama, which conducted business as Alabama Amusements. Thereafter, Awtrey either performed or was in charge of the day-to-day field operations for Alabama Amusements. And in that role, Awtrey procured customers in whose respective business locations amusement machines were placed, collected money generated by placed machines, and retained from the collected money his earned wages and incurred expenses. This evidence showed that the three Alabama businesses were customers of Alabama Amusements; the evidence did not further show that the three Alabama business were also customers of All Star; nor did the evidence otherwise establish any business relationship between those three Alabama businesses and All Star.

We reject All Star's assertion that evidence that it was "affiliated" with Alabama Amusements demonstrated that it, too, had a business relationship with Alabama Amusements' customers. This assertion disregards the legal significance of the undisputed fact that

---

[13] See Court of Appeals Rule 25 (a) (1).

148

All Star and Alabama Amusements were each a corporation. "The law of corporations is founded on the legal principle that each corporation is a separate entity."[14] "Great caution should be exercised by the court in disregarding the corporate entity."[15] "In any event, the mere existence of some unspecified 'affiliation' is not sufficient to pierce the corporate veil."[16]

We must also reject All Star's characterization of Alabama Amusements as its agent, such that All Star can be credited with Alabama Amusements' customers. This characterization is another attempt to escape the ramifications of the well-founded legal principle of corporate separateness. Although All Star showed instances in which it disregarded its corporate separateness from Alabama Amusements, such acts can serve as no justification for the court also to disregard it for All Star's benefit.

> The concept of piercing the corporate veil is based upon equitable principles. As a general rule, a party cannot invoke the aid of equitable principles when he does not come into court with clean hands. Yet, [All Star] seeks to assert [its] [ ]claim based upon [its own] abuse of the corporate form, a proposition we reject.[17]

While "the law authorizes the formation of subservient corporations, the law would defeat its own purpose by disregarding its own creature merely because a parent corporation, or other sole owner, controls the subsidiary, or one-man corporation, and uses it and controls it to promote his or its ends."[18]

When construed most favorably for All Star, the evidence failed to establish any business relationship as alleged, and therefore, defense verdicts were demanded.

(b) *The "Stranger" Doctrine.* In reliance upon *Tom's Amusement Co. v. Total Vending Svcs.*,[19] Awtrey and Fellows argued that they were not strangers to the alleged business relationships and

---

[14] *Hickman v. Hyzer*, 261 Ga. 38, 39 (1) (401 SE2d 738) (1991).

[15] Id. (citation and punctuation omitted).

[16] *Yukon Partners*, supra.

[17] *Pantusco v. Wiley*, 274 Ga. App. 144, 146 (1) (616 SE2d 901) (2005) (footnotes omitted).

[18] *Yukon Partners*, supra (citation omitted).

[19] 243 Ga. App. 294 (533 SE2d 413) (2000) (physical precedent only). All Star concedes on appeal that "Awtrey was not a stranger to the relationship, as defined by *Tom's Amusement Company, Inc.*," pursuing this contention only as to Fellows. At trial, All Star presented evidence that Fellows was its employee. Fellows thus relied upon the following language in *Tom's Amusement Co.*: "Regardless of whether an employee is acting as an agent of his employer when engaging in the interference, he is not a stranger to the business relationship between his employer and the customers he personally services and thus cannot be held liable under a claim of tortious interference." Id. at 296 (2) (a).

therefore not liable for tortious interference thereof. The record reveals that much of the motion hearing as to this element focused on *Tom's Amusement Co.* without any concern that "one judge of the three concurred in the judgment only. For that reason, it is not binding authority and is physical precedent only."[20] Nevertheless, our decision in Division 1 (a) renders moot whether All Star presented any evidence to satisfy the "stranger" doctrine.

2. All Star contends that the trial court erred in allowing certain exhibits in evidence, which Awtrey and Fellows presented to defend against All Star's conversion claims.

All Star alleged that, having terminated their employment from Simmons's corporations, Awtrey and Fellows absconded with certain monies collected from machines Awtrey had been servicing in Alabama, as well as the balance in Alabama Amusements' bank account. Awtrey and Fellows maintained, however, that the amount taken was owed them by Alabama Amusements in commissions, pursuant to their earlier agreement with Simmons to be paid commissions based upon that corporation's revenue. They contended that the sums taken never belonged to All Star, relying on evidence that All Star was not registered to do business in Alabama; and that the funds retained by them were funds that had belonged to Alabama Amusements, the entity that was operating in Alabama.

There is no merit in All Star's argument that the cited evidence was not admissible because Awtrey's and Fellows's claims of entitlement to the funds were in the nature of recoupment,[21] which they had not pled in this case.[22] Awtrey's and Fellows's positions with respect to the retained amount were not in the nature of recoupment, but a defense. The trial court did not abuse its discretion in allowing the exhibits in support thereof.[23]

*Judgment affirmed. Johnson, P. J., and Barnes, J., concur.*

DECIDED MARCH 27, 2009.

*Lamalva & Oeland, Paul J. Oeland IV,* for appellant.

---

[20] *Carter v. State,* 222 Ga. App. 345, 346 (1) (474 SE2d 240) (1996); see Court of Appeals Rule 33 (a).

[21] See OCGA § 13-7-2 ("Recoupment is a right of the defendant to have a deduction from the amount of the plaintiff's damages for the reason that the plaintiff has not complied with the cross-obligations or independent covenants arising under the contract upon which suit is brought.").

[22] See generally *Burnham v. Cooney,* 265 Ga. App. 246, 248-250 (3) (593 SE2d 701) (2004).

[23] Id.