*Jason H. Coffman*, for appellant.
*Hurt, Stolz & Cromwell, James W. Hurt, Jr.*, for appellee.

## A11A1235. SOUTHLAND PROPANE, INC. et al.
## v. MCWHORTER.
(720 SE2d 270)

DILLARD, Judge.

In 1994, Charles Arrington and Benny McWhorter formed LaGrange Propane Services, Inc. ("LPS") as a closely held corporation. Arrington and McWhorter operated LPS until 2004, when Arrington terminated McWhorter's employment and foreclosed on all of LPS's assets. Thereafter, McWhorter sued Arrington, Arrington's three sons, and Southland Propane, Inc. (the new company that Arrington and his sons had formed) (collectively "defendants"), alleging damages based on numerous claims, including defendants' conversion of his corporate interests, defamation, breach of fiduciary duty, fraud, and intentional infliction of emotional distress. Following a trial, the jury rendered a verdict in favor of McWhorter on several of his claims, awarding him compensatory and punitive damages, and the trial court entered judgment accord-

---

ingly. Defendants now appeal, arguing that the trial court erred in (1) allowing McWhorter to bring a direct action, instead of a derivative action on behalf of LPS, as to the claims pertaining to his corporate interests; (2) denying defendants' motion for judgment notwithstanding the verdict (j.n.o.v.) as to McWhorter's claims for conversion, fraud, breach of fiduciary duty, and intentional infliction of emotional distress; (3) denying a challenge to McWhorter's expert witness; (4) admitting prejudicial evidence; and (5) allowing punitive damages. For the reasons set forth infra, we conclude that the trial court's error in allowing McWhorter to bring a direct action on his corporate-interest claims and denying defendants' motion for j.n.o.v. as to McWhorter's intentional-infliction-of-emotional-distress claim requires reversal as to those claims and as to the award of punitive damages. Nevertheless, because the jury's verdict in McWhorter's favor on his defamation claim—which defendants do not appeal —can support an award of punitive damages, we remand the case for further proceedings consistent with this opinion.

At the outset, we note that "[o]n appeal from the denial of a motion for a directed verdict or for j.n.o.v., we construe the evidence in the light most favorable to the party opposing the motion, and the standard of review is whether there is any evidence to support the jury's verdict."[1] However, "[w]e review questions of law de novo, applying the plain legal error standard of review."[2]

So viewed, the record shows that McWhorter, who was married to Charles Arrington's sister, had worked in the propane business for over 20 years. In 1994, Arrington and McWhorter decided to start their own propane business, resulting in the incorporation of LPS. The company was created pursuant to a plan in which Arrington would provide the initial financing, own 51 percent of the stock, and act as the CEO and president. McWhorter, on the other hand, would own 49 percent of the stock, act as treasurer, and handle the day-to-day operations of the company.

Arrington initially contributed approximately $100,000 in startup funds, and LPS operated out of property that Arrington owned and for which it paid Arrington rent. Later, LPS moved to another property owned by Arrington and his wife. To facilitate this move, Arrington's wife transferred her half interest in the property to McWhorter, after which he and Arrington took out a loan from a local bank, which was secured by the property, in order to finance the construction of the company's office and plant buildings. The construction of these buildings was completed by Mid-South Mechani-

[1] *Park v. Nichols*, 307 Ga. App. 841, 845 (2) (706 SE2d 698) (2011) (punctuation omitted).
[2] *Timmons v. Cook*, 287 Ga. App. 712, 712 (652 SE2d 604) (2007).

cal, which was a company wholly owned by Arrington, and the property was then leased to LPS.

Over the course of the next several years, Arrington allegedly loaned over $600,000 to LPS. During this same period of time, Arrington and McWhorter also financed the company by issuing numerous promissory notes to Arrington and his sons, David, Mike, and Greg, for loans they had provided to LPS after obtaining their own loans that were secured by various properties they respectively owned. Several of these notes were obtained so that LPS could finance United Heating and Air ("UHA"), which was a company that Arrington and McWhorter incorporated in early 2002 in an attempt to create a business that would generate income during the warmer months of the year when propane sales diminished. However, UHA was never financially successful, and it ultimately ceased operations in December 2002 after LPS foreclosed on its assets.

Throughout LPS's existence, both Arrington and McWhorter regularly used company funds to pay for personal expenses. For instance, McWhorter made nondescript payments to his wife (Arrington's sister), who was not employed by LPS, for a short period of time and allowed his daughter, who did work for LPS, to use company funds to have her home painted and car repaired. McWhorter also used LPS funds, with Arrington's approval, to build a lake on his property and make various and sundry improvements to his home. Similarly, Arrington used company funds for miscellaneous personal expenses, including purchasing automobiles for his wife and son's use. In addition, although Arrington only sporadically paid himself a salary, he regularly wrote checks to himself using company funds, and at some point in time, he authorized the use of LPS funds to pay his wife and son small salaries.

In 2003, Arrington and McWhorter's personal and business relationship began to sour due to McWhorter's failing marriage to Arrington's sister, which ended in divorce later that same year. During the course of the divorce proceedings, McWhorter's counsel opined that LPS's debts outweighed its assets. At that same time, Arrington offered to purchase McWhorter's stock in LPS for $200,000. And although McWhorter was initially receptive to this offer, the potential deal was scuttled when McWhorter maintained that he would attempt to seek employment with another propane business and adamantly refused to sign a noncompete clause that Arrington made a condition of any such settlement.

On April 21, 2004, Arrington and his corporate counsel confronted McWhorter at LPS's office, accused him of misappropriating corporate funds, terminated his employment, and ordered him to immediately leave the premises. Additionally, Arrington reported his suspicions concerning McWhorter to the sheriff's department, and

shortly thereafter, further reported his suspicion that McWhorter had forged company checks to various vendors so that he could pocket the funds for his own personal use. McWhorter was eventually arrested on forgery charges, but he was never incarcerated, and the charges were quickly dropped after the district attorney determined that there was not enough evidence to prosecute. Nevertheless, Arrington informed the local newspaper as to McWhorter's arrest in an attempt to have it publicized, and he prominently displayed a copy of McWhorter's booking photograph at LPS's office.

A few months later, Arrington and his sons foreclosed on LPS's assets to cover its various debts and then used the proceeds to form Southland Propane, Inc. Arrington also attempted to collect on a promissory note for approximately $198,000, which McWhorter had purportedly signed but which he maintained was a forgery.

Thereafter, McWhorter filed suit against Arrington, his three sons, and Southland Propane, alleging claims of defamation and tortious interference with business and contractual relationships. Arrington then filed suit against McWhorter to collect on the $198,000 promissory note. Three years later, McWhorter amended his complaint to allege additional claims of conversion, breach of fiduciary duty, fraud, wrongful discharge, slander of title, malicious prosecution, and intentional infliction of emotional distress. The parties then conducted extensive discovery, but following its conclusion, neither McWhorter nor the defendants filed any motions for summary judgment or even a pretrial order. Instead, the parties proceeded directly to trial, which lasted nine days.

After McWhorter presented his case, the defendants moved for a directed verdict on all of his claims, individually, based on a lack of evidence. The defendants also argued, alternatively, that the claims pertaining to McWhorter's interest in LPS should be dismissed because McWhorter failed to file a derivative action. The trial court denied this motion. And while the trial court granted a directed verdict in the defendants' favor as to McWhorter's claims for tortious interference, wrongful discharge, slander of title, and malicious prosecution, it denied their motion as to all remaining claims, including McWhorter's claim for punitive damages.

At the conclusion of the trial, the jury returned a verdict in McWhorter's favor and awarded him $600,000 against all defendants for the conversion claim; $25,000 against Arrington and two of his sons, David and Greg, for the defamation claim; $100,000 against Arrington for the breach-of-fiduciary-duty claim; $250,000 against Arrington for the fraud claim; and $250,000 against Arrington for the intentional-infliction-of-emotional-distress claim. The jury also found in McWhorter's favor as to Arrington's attempt to collect on the $198,000 promissory note. In addition, the jury found that

Arrington acted with a specific intent to cause McWhorter harm and, thus, awarded him $225,000 in punitive damages. Subsequently, the trial court issued a judgment affirming the jury's verdict. Defendants then filed a motion for j.n.o.v., which the trial court denied after conducting a hearing on the matter. This appeal follows.

1. Defendants contend that the trial court erred in denying their motion for j.n.o.v., arguing that McWhorter lacked standing to bring a direct action, as opposed to a derivative action, on the claims pertaining to his corporate interests. We agree that McWhorter's claims for conversion, fraud, and breach of fiduciary duty should have been pursued via a derivative action, and therefore, we are constrained to reverse the jury's verdict as to those claims.

A "derivative suit is brought on behalf of [a] corporation for harm done to it and any damages recovered are paid to the corporation."[3] And "[t]he determination of whether a claim is derivative or direct is made by looking to what the pleader alleged."[4] Indeed, it is "the nature of the wrong alleged and not the pleader's designation or stated intention that controls the court's decision."[5] However, "the general rule is that allegations of misappropriation of corporate assets and breach of fiduciary duty can only be pursued in a shareholder derivative suit brought on behalf of the corporation, [because] the injury is to the corporation and its shareholders collectively."[6]

And while plaintiffs may bring direct actions for injuries done to them in their individual capacities by corporate fiduciaries, our Supreme Court has held that "to have standing to sue individually, rather than derivatively on behalf of the corporation, the plaintiff must allege more than an injury resulting from a wrong to the corporation."[7] As such, "to set out an individual action, the plaintiff must allege either an injury which is separate and distinct from that suffered by other shareholders, or a wrong involving a contractual right of a shareholder which exists independently of any right of the corporation."[8]

That said, "a direct action may nevertheless be proper in the context of a closely held corporation *where the circumstances show that the reasons for the general rule requiring a derivative suit do not*

---

[3] *Southwest Health & Wellness, LLC v. Work*, 282 Ga. App. 619, 624 (2) (b) (639 SE2d 570) (2006).

[4] *Id.* at 624 (2) (a) (punctuation omitted).

[5] *Id.* (punctuation omitted).

[6] *Barnett v. Fullard*, 306 Ga. App. 148, 152 (3) (a) (701 SE2d 608) (2010).

[7] *Phoenix Airline Svcs., Inc. v. Metro Airlines, Inc.*, 260 Ga. 584, 586 (1) (397 SE2d 699) (1990).

[8] *Id.* (punctuation omitted).

*apply.*"[9] The reasons for ordinarily requiring derivative suits are:

> (1) to prevent multiple suits by shareholders; (2) to protect corporate creditors by ensuring that the recovery goes to the corporation; (3) to protect the interest of all the shareholders by ensuring that the recovery goes to the corporation, rather than allowing recovery by one or a few shareholders to the prejudice of others; and (4) to adequately compensate injured shareholders by increasing their share values.[10]

Here, given that Arrington and McWhorter were LPS's only shareholders, there was no threat of multiple lawsuits by shareholders nor any possibility that a recovery would prejudice the rights of other shareholders. Nevertheless, there was evidence presented during trial of creditors who were potentially in need of protection. In fact, McWhorter testified that one of LPS's customers, Kimberly-Clark, had paid $750,000 in advance for propane prior to LPS being dissolved and had threatened legal action based on the fact that LPS was no longer able to perform on that contract. McWhorter further testified that Wittichen Supply, another LPS customer, was possibly in a position similar to Kimberly-Clark. In addition, McWhorter noted that LPS owed other creditors for funds it used to procure its facility's bulk tank and company vehicles. And given the evidence regarding the existence of LPS's creditors who may potentially need the protection afforded by a shareholder's derivative suit, the exception permitting a direct action in the context of a closely held corporation is wholly inapplicable in the case sub judice.[11] Accordingly, the trial court erred in failing to grant defendants' motion for j.n.o.v. on this issue, and we, therefore, reverse the jury's verdict as to McWhorter's claims for conversion, fraud, and breach of fiduciary duty.[12]

---

[9] *Southwest Health & Wellness, LLC*, 282 Ga. App. at 626 (2) (c) (emphasis in original) (punctuation omitted).

[10] *Id.*

[11] *Cf. Barnett*, 306 Ga. App. at 153-54 (3) (b) (holding that because all of corporation's shareholders were not parties to lawsuit, risk of multiple lawsuits prohibited shareholder's direct action); *Levy v. Reiner*, 290 Ga. App. 471, 474 (2) (659 SE2d 848) (2008) (same). *Compare Rosenfeld v. Rosenfeld*, 286 Ga. App. 61, 65 (2) (648 SE2d 399) (2007) (holding that trial court correctly found that minority shareholder of a closely held corporation could bring a direct action against her husband as majority shareholder in light of the fact that husband's own testimony indicated that the corporation was paying its debts as they came due and that the corporation had no creditors who were at threat of not being paid).

[12] In reaching this conclusion, we are fully aware that there is a certain degree of cognitive dissonance involved in holding that McWhorter was required to prosecute his corporate-interest claims via a derivative action when both he and Arrington engaged in

2. In light of our holding in Division 1, we need not address defendants' separate enumerations of error that contend that McWhorter failed to provide sufficient evidence to support his claims for conversion, fraud, and breach of fiduciary duty. Furthermore, we need not address defendants' challenge to McWhorter's expert witness nor their contention that the trial court erred in admitting prejudicial testimony regarding Arrington's alleged extra-marital affair, as those issues also pertain to the claims we have reversed.

3. Defendants also contend that the trial court erred in denying their motion for j.n.o.v. as to McWhorter's intentional-infliction-of-emotional-distress claim, arguing the evidence was insufficient to support it as a matter of law. We agree.

It is well settled that to recover on a claim of intentional infliction of emotional distress, "a plaintiff must show evidence that: (1) defendants' conduct was intentional or reckless; (2) defendants' conduct was extreme and outrageous; (3) a causal connection existed between the wrongful conduct and the emotional distress; and (4) the emotional harm was severe."[13] Indeed,

> [i]t has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by malice, or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been extreme and outrageous.[14]

This Court has held that extreme and outrageous conduct is that which is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as

---

conduct (as noted *supra*) that would arguably justify piercing LPS and/or Southland Propane's "corporate veil." *See Renee Unlimited, Inc. v. City of Atlanta*, 301 Ga. App. 254, 259 (2) (b) (687 SE2d 233) (2009) (holding that the "concept of piercing the corporate veil is applied in Georgia to remedy injustices which arise where a party has overextended his privilege in the use of a corporate entity in order to defeat justice, perpetuate fraud or to evade contractual or tort responsibility"). Nevertheless, the existence of creditors who may potentially be in need of the protection afforded by a shareholder's derivative suit requires us to (for the time being) respect the corporate form. *Cf. All Star, Inc. v. Fellows*, 297 Ga. App. 142, 148 (676 SE2d 808) (2009) ("The concept of piercing the corporate veil is based upon equitable principles," and "[a]s a general rule, a party cannot invoke the aid of equitable principles when he does not come into court with clean hands . . . [—*i.e.*, when a party] seeks to assert its claim based upon its own abuse of the corporate form") (citation and punctuation omitted); *In re Kaplan*, 143 F3d 807, 811-12 (II) (3rd Cir. 1998) ("The derivative injury rule holds that a shareholder (even a shareholder in a closely-held corporation) may not sue for personal injuries that result directly from injuries to the corporation . . . [and] prevents [a shareholder] from piercing the corporate veil in reverse in order to recover individually for [corporate] losses").

[13] *Abdul-Malik v. AirTran Airways, Inc.*, 297 Ga. App. 852, 856 (1) (678 SE2d 555) (2009).

[14] *Id.* (punctuation omitted).

atrocious, and utterly intolerable in a civilized community."[15] Importantly, "[w]hether a claim rises to the requisite level of outrageousness and egregiousness to sustain a claim for intentional infliction of emotional distress is a question of law."[16]

The evidence of intentional infliction of emotional distress in this case fails to rise to the requisite level of outrageousness. McWhorter claims that defendants' actions on the day that his employment with LPS was terminated constituted an intentional infliction of emotional distress. Specifically, McWhorter alleges that Arrington accusing him of misappropriating corporate funds and forgery, terminating his employment, and then ordering him to immediately leave the LPS premises constituted extreme and outrageous conduct. Nevertheless, "[c]omments made within the context of one's employment may be horrifying or traumatizing, but [they] are generally considered a common vicissitude of ordinary life."[17] And "[t]he same is true of false accusations of dishonesty in the workplace."[18] Under the totality of the circumstances, Arrington's conduct at the time that McWhorter's employment was terminated did not exceed the bounds usually tolerated by society; thus, it was not extreme and outrageous.[19]

Furthermore, McWhorter did not produce any evidence at trial that he suffered "severe" emotional harm as a result of defendants' conduct. As we have previously held,

> [e]motional distress includes all highly unpleasant mental reactions such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea. It is only where it is *extreme* that liability arises. The law intervenes only where the distress inflicted is so severe that no reasonable (person) could be expected to endure it.[20]

And "[w]hether severe emotional distress can be found, based on the

---

[15] *Biven Software, Inc. v. Newman*, 222 Ga. App. 112, 113-14 (1) (473 SE2d 527) (1996) (punctuation omitted).

[16] *Yarbray v. Southern Bell Tel. & Tel. Co.*, 261 Ga. 703, 706 (2) (409 SE2d 835) (1991).

[17] *Abdul-Malik*, 297 Ga. App. at 857 (1) (punctuation omitted).

[18] *Id.*

[19] *See id.* (holding that plaintiff failed to show as a matter of law that employer's conduct was extreme and outrageous where employer interrogated plaintiff for allegedly making terroristic threats and called him a terrorist and a liar); *Crowe v. J.C. Penney*, 177 Ga. App. 586, 588 (1) (340 SE2d 192) (1986) (affirming summary judgment based on plaintiff's failure as a matter of law to show extreme and outrageous conduct where employer interrogated plaintiff for theft, called her a liar, slammed his hands on the desk, and yelled at her).

[20] *Abdul-Malik*, 297 Ga. App. at 858 (1) (punctuation omitted).

evidence presented, is a question for the court to decide.''[21]

Here, when McWhorter was questioned by his own counsel on this issue during trial, the following exchange occurred:

Q. When you got put out on April the 21st or 22nd of 2004, did that cause any distress?

A. Oh, yes.

Q. What kind of distress?

A. Well, financial distress, mental, physical distress. I mean, it just, you know, like everything come down at one time. I mean.

Q. Emotional distress?

A. Yes.

Q. Were you, at the time that you got discharged, able to go get a job right away?

A. No, I was not.

Q. Why not?

A. I mean, wasn't anyone hiring. I've always been in the propane business. And you know it was April and that was going into the summer months. You know, you really don't hire new hires to go through the summertime.

Beyond merely reasserting that he suffered emotional distress, McWhorter offered no evidence to support this claim. Indeed, at no point during the lengthy trial did McWhorter testify about any physical, mental, or emotional symptoms he suffered that were related to his distress. Nor did he provide any evidence that defendants' conduct caused him to take medication or seek medical or psychological help. Thus, McWhorter failed to provide sufficient evidence that he suffered from emotional distress so severe that no reasonable person could be expected to endure it.[22] Accordingly, the trial court erred in denying defendants' motion for j.n.o.v. and earlier motion for directed verdict as to McWhorter's intentional-infliction-of-emotional-distress claim.

---

[21] Id.

[22] See Jones v. Warner, 301 Ga. App. 39, 43 (3) (686 SE2d 835) (2009) (holding that plaintiff's testimony that she suffered anxiety, nervousness, sleeplessness, and irritability for one month after the arrest, as well as her failure to seek medical or psychiatric treatment for these symptoms, was insufficient to show that her symptoms were sufficiently severe); Abdul-Malik, 297 Ga. App. at 858 (1) (holding that plaintiff's emotional distress claim failed because his sleeplessness and weight gain, for which he did not take medication or seek professional help, were not sufficiently severe); Odem v. Pace Academy, 235 Ga. App. 648, 656 (2) (510 SE2d 326) (1998) (holding that emotional distress was not sufficiently severe where plaintiff suffered marginally high blood pressure but sought no professional advice).

4. Defendants further contend that the trial court erred in denying their motion for j.n.o.v. as to the award of punitive damages. Given our holdings supra, McWhorter's claims for conversion, fraud, breach of fiduciary duty, and intentional infliction of emotional distress cannot provide the basis for any punitive-damages award.[23] However, the jury's verdict in favor of McWhorter on his defamation claim, which defendants did not appeal, could support recovery of punitive damages.[24] Unfortunately, the verdict form in this case merely states that punitive damages should be awarded to McWhorter "against Charles Arrington" but does not allow us to determine the underlying theory upon which the jury based its award. Accordingly, the award for punitive damages must be reversed, and we remand this case for a new trial solely on the issue of whether punitive damages are warranted based on the jury's verdict in McWhorter's favor on his defamation claim.[25]

*Judgment reversed and case remanded with direction. Phipps, P. J., and Andrews, J., concur.*

DECIDED NOVEMBER 22, 2011 — 

*Waldrep, Mullins & Callahan, Neal J. Callahan*, for appellants.
*Kam & Ebersbach, Michael G. Kam, Charles M. Cork III*, for appellee.

---

[23] *See Wolff v. Middlebrooks*, 256 Ga. App. 268, 271-72 (3) (568 SE2d 88) (2002) (holding that punitive damages could not be awarded on underlying claims for which there was no liability).

[24] *See Milum v. Banks*, 283 Ga. App. 864, 870 (2) (642 SE2d 892) (2007) (holding that defamation may support award of punitive damages); *Wolff*, 256 Ga. App. at 272 (3) (same).

[25] *See Wolff*, 256 Ga. App. at 272 (3).