**FOURTH DIVISION**
**DILLARD, C. J.,**
**DOYLE, P. J., and MERCIER, J.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**October 2, 2018**

# In the Court of Appeals of Georgia

A18A1232. PATEL et al. v. 2602 DEERFIELD, LLC.

DILLARD, Chief Judge.

A group of shareholders, operating as Southeastern Hospitality Management, Inc. ("Southeastern"), purchased a tract of commercial property in Albany, Georgia, that included a distressed hotel. Approximately one year later, Southeastern sold the property to South Georgia Partners, LLC ("SGP"). Thereafter, 2602 Deerfield, LLC ("Deerfield"), a Southeastern shareholder, and Deerfield's owners, Rajendra Patel and Savan Patel, filed suit against, among others, Southeastern shareholders Milan Patel, Umang Patel, and SGP. Specifically, the plaintiffs alleged that Milan and Umang failed to disclose to the other Southeastern shareholders the existence of a valuable lease on the property or their interest in SGP, resulting in Southeastern selling the

property to SGP for less than it was worth.[1] The plaintiffs asserted numerous causes of action, including claims for breach of fiduciary duty, breach of the duty of loyalty, and fraud. Thereafter, the defendants filed a motion for summary judgment, arguing that the plaintiffs should have brought their claims in a derivative action on behalf of Southeastern, rather than as a direct action. But the trial court denied in part this motion, and the defendants appealed. For the reasons set forth *infra*, we reverse.

Viewed in the light most favorable to the plaintiffs (*i.e.*, the nonmoving parties),[2] the record shows that Rajendra was a friend and business associate of Milan's father. In 2010, Rajendra, and his son, Savan—both residents of New Jersey—decided to purchase a note, secured by a 4.6-acre tract of commercial property in Albany, Georgia, containing a then-closed hotel. Savan and Rajendra decided to buy the note with Milan and Umang, business partners who first became friends in college. The note was initially purchased for just over $880,000 by a different entity owned by Savan and Rajendra, but it was later transferred to

---

[1] Because numerous parties and witnesses in this case share the same last name, Patel, we refer to them by their first names for the sake of clarity. We have also included a flow chart as an appendix to this opinion to further assist the reader, showing the parties' ownership interests at the time of the lease transfer.

[2] *See, e.g.*, *Shekhawat v. Jones*, 293 Ga. 468, 469 (746 SE2d 89) (2013).

Southeastern, an "open" Georgia corporation. With regard to the note, Savan and Rajendra were responsible for providing 50 percent of the capital, which they did through Deerfield, a corporation in which they were shareholders. Likewise, Milan and Umang were responsible for providing the other 50 percent of the capital. Milan and Umang each contributed a portion of the capital themselves, and they raised the rest of the money from their family and close friends. Ultimately, Southeastern was owned by the following shareholders: Deerfield; Milan; Umang; Umang's father-in-law, Rajesh Desai; Umang's grandfather, Vallabhbhai Patel;[3] Milan's father-in-law, Sudhir Patel; and Milan and Umang's friends, Sunil Nair, Chirag Patel, and Rahul Patel. Milan and Umang unilaterally made themselves officers of Southeastern, which followed no corporate formalities and had no operating agreement. And, because they lived in Georgia, Milan and Umang handled the corporation's day-to-day operations.

The Southeastern shareholders' plan was to "maximize" the property's value, either by opening and operating the closed hotel or finding other commercial tenants. To that end, Southeastern obtained a deed in lieu of foreclosure on the property, and it briefly reopened the hotel in May 2011. Meanwhile, Savan, Rajendra, and Milan sought tenants and other business opportunities for the property. But in the spring of

---

[3] Vallabhbhai passed away in October 2013.

3

2011, Milan and Umang told Savan and Rajendra that they had not been able to locate any tenants and they recommended that Southeastern sell the property.

In August 2011, Milan, acting on behalf of Southeastern, signed a purchase and sale agreement to transfer the property to SGP for $1,600,000. Umang represented to Savan and Rajendra that SGP was comprised of "a group of doctors from Columbus, Georgia." But in fact, Umang organized SGP. And initially, Umang owned 100 percent of SGP; but he later transferred two-thirds of his interest to Milan.

Shortly after Southeastern committed to the purchase and sale agreement with SGP, Milan signed a 30-year lease on behalf of the corporation to develop an Olive Garden restaurant on the property. At the closing, with Milan and Umang acting on behalf of both Southeastern and SGP, Southeastern assigned its interest in the Olive Garden lease to SGP. And ultimately, on February 14, 2012, the day after Umang transferred part of his interest in SGP to Milan, SGP purchased the property for $1,550,000. According to evidence adduced by the plaintiffs, however, at the time of the 2012 sale, the property was actually worth $3,500,000.[4]

---

[4] In 2015 and 2016, the value of the property was estimated to be between $4,475,000 and $5,736,000.

Thereafter, Umang and Milan transferred their entire interests in SGP to their wives and other family members—including a five percent interest to each of their fathers-in-law, Rajesh and Sudhir. Despite the transfer, Milan and Umang continued to manage SGP, handling the day-to-day operations. Then, in 2014, Milan and Umang subdivided the property and created Dawson Road Partners, LLC ("DRP") to hold the then-vacant land, while SGP continued to hold the portion of the property containing the Olive Garden restaurant. The same people who own SGP, including Rajesh and Sudhir, also own DRP. And as with SGP, Milan and Umang manage DRP.

In September 2015, the plaintiffs—Deerfield, Rajendra, and Savan—filed suit against Milan, Umang, SGP, and DRP, asserting numerous claims, including claims for breach of fiduciary duty, breach of the duty of loyalty, fraud, conspiracy, fraudulent transfer, state RICO violations, punitive damages, and attorney fees. Specifically, the plaintiffs allege that Milan and Umang, *inter alia*, failed to inform them of and made affirmative misrepresentations regarding the Olive Garden lease and their interest in SGP prior to the sale of the property. Initially, Southeastern was also a plaintiff, but it subsequently dismissed its claims against the defendants.[5]

---

[5] The plaintiffs also dismissed a claim for usurpation of corporate opportunities.

Discovery ensued, during which evidence was adduced that Sudhir and Rajesh, Milan and Umang's fathers-in-law, were satisfied with their investments in Southeastern, had no concerns regarding Milan and Umang's management of the company, and would not sue Milan and Umang over the investment. Likewise, Sunil Nair, one of the other nonparty shareholders, was also satisfied with his investment in Southeastern. Sunil later partnered with Milan and Umang in another business venture and testified in a deposition that he believed they were honest.

One of the other nonparty shareholders, Rahul—who also had other business deals with Milan—testified at his deposition that he received no updates about the property development and knew nothing about the Olive Garden lease. Nevertheless, he trusted Milan and was pleased with the return on his investment in Southeastern. And while he did not believe that Milan and Umang lied to him or caused him any damage, Rahul did not have a clear understanding of the lawsuit. Indeed, at the time of his deposition in October 2016, Rahul had not consulted with a lawyer or made a decision regarding whether to join the suit as a plaintiff.

Chirag, the final nonparty shareholder, was still involved in a different business deal with Umang at the time of his December 2016 deposition Chirag testified that, initially, he trusted Umang and Milan and expressed no dissatisfaction with the return

on his investment in Southeastern because "[he] had no clue about anything." He later learned of the Olive Garden lease and asked Umang about it. Suffice it to say, Chirag was not happy that Umang had failed to disclose the lease earlier, but he figured, "I got what I got for it and I'm happy with it and I moved on with it." But when Chirag learned of the lawsuit, he was shocked, upset, and became concerned that he lost money on the venture because the property should have been sold at a higher price. In that regard, Chirag explained that "if there was money left on the table and I didn't receive it, I need to get that money." Morever, if the plaintiffs were going to recover damages, Chirag did not want to be left out. And when asked if Umang had ever communicated anything to him that he believed to be false, Chirag replied that he was told the property was priced at $1,600,000, and that Umang failed to disclose his own investment in SGP.

At time of his deposition, Chirag had not spoken to an attorney, but he said, "I'm still weighing my options on what I want to do at this moment. . . . [W]hen I do make the decision, I will seek my own counsel and figure out things on my own, whatever I need to do." In addition to the deposition testimony detailed *supra*, Sunil, Rahul, and Chirag also filed affidavits, in which they averred that they had "not ruled out the possibility of filing a lawsuit" against Milan and Umang. In contrast to Rajesh

7

and Sudhir, the other nonparty shareholders were not given an opportunity to purchase any interest in SGP.

Based on the foregoing evidence, the defendants filed a motion for summary judgment, arguing, *inter alia*, that the plaintiffs were asserting impermissible direct claims. The defendants also asserted that Savan and Rajendra had no standing to bring any claims because they were not Southeastern shareholders.

Following a hearing, the trial granted summary judgment to the defendants as to the claims by Savan and Rajendra, finding that they had no standing to assert direct claims, and dismissed them. But the court denied the defendants' motion for summary judgment as to Deerfield, finding that its claims could be brought in a direct action. Following the denial, in part, of the motion for summary judgment, the defendants obtained a certificate of immediate review. Shortly thereafter, this Court granted interlocutory review. This appeal follows.

The standards for summary adjudication are well settled. Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to judgment as a matter of law[.]"[6]

A summary judgment ruling enjoys "no presumption of correctness on appeal, and an appellate court must satisfy itself de novo that the requirements of OCGA § 9-11-56 (c) have been met."[7] Importantly, it is not the role of this Court to "sort through the evidence, resolve conflicts, and make findings of fact based on the evidence it finds credible."[8] Rather, in our *de novo* review of a trial court's denial of a motion for summary judgment, we must "determine whether there is a genuine issue of material fact and whether the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law."[9]

---

[6] OCGA § 9-11-56 (c). *See Hardin v. Hardin*, 301 Ga. 532, 536 (801 SE2d 774) (2017) ("To prevail at summary judgment under OCGA § 9-11-56, the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law." (punctuation omitted)).

[7] *Cowart v. Widener*, 287 Ga. 622, 624 (1) (a) (697 SE2d 779) (2010); *accord Hardin*, 301 Ga. at 537.

[8] *Hardin*, 301 Ga. at 536 (punctuation omitted); *accord Montgomery v. Barrow*, 286 Ga. 896, 898 (1) (692 SE2d 351) (2010).

[9] *Shekhawat*, 293 Ga. at 469; *accord Youngblood v. Gwinnett Rockdale Newton Cmty. Serv. Bd.*, 273 Ga. 715, 717-18 (4) (545 SE2d 875) (2001).

Here, in several related claims of error, the defendants assert that the trial court applied incorrect legal standards and thus erred in concluding that Deerfield's direct claims could proceed. We agree.

As this Court has previously explained, "[a] derivative suit is brought on behalf of a corporation for harm done to it and any damages recovered are paid to the corporation."[10] And the determination of whether a claim is derivative or direct is made by "looking to what the pleader alleged."[11] Importantly, it is "the nature of the wrong alleged and not the pleader's designation or stated intention that controls the court's decision."[12] Nonetheless, the general rule is that "allegations of misappropriation of corporate assets and breach of fiduciary duty can only be pursued

---

[10] *Southland Propane, Inc. v. McWhorter*, 312 Ga. App. 812, 816 (1) (720 SE2d 270) (2011) (punctuation omitted); *accord Crittenton v. Southland Owners Ass'n, Inc.*, 312 Ga. App. 521, 524 (2) (718 SE2d 839) (2011).

[11] *McWhorter*, 312 Ga. App. at 816 (1) (punctuation omitted); *accord Phoenix Airline Servs., Inc. v. Metro Airlines, Inc.*, 260 Ga. 584, 585 (1) (397 SE2d 699) (1990).

[12] *McWhorter*, 312 Ga. App. at 816 (1) (punctuation omitted); *accord Phoenix Airline Servs.*, 260 Ga. at 585 (1).

in a shareholder derivative suit brought on behalf of the corporation, because the injury is to the corporation and its shareholders collectively."[13]

Although a plaintiff may bring a direct action for injuries done to it in its individual capacity by corporate fiduciaries, "our Supreme Court has held that to have standing to sue individually, rather than derivatively on behalf of the corporation, the plaintiff must allege more than an injury resulting from a wrong to the corporation."[14] Thus, to set out an individual action, the plaintiff must "allege either an injury which is separate and distinct from that suffered by other shareholders, or a wrong involving a contractual right of a shareholder which exists independently of any right of the corporation."[15] But even if a shareholder fails to allege a special injury, it may nevertheless bring a direct action if the corporation is closely held and *"the*

---

[13] *McWhorter*, 312 Ga. App. at 816 (1) (punctuation omitted); *accord Barnett v. Fullard*, 306 Ga. App. 148, 152 (3) (a) (701 SE2d 608) (2010).

[14] *McWhorter*, 312 Ga. App. at 816 (1) (punctuation omitted); *accord Crittenton*, 312 Ga. App. at 524 (2); *see also Phoenix Airline Servs.*, 260 Ga. at 585 (1) ("The general rule is that actions for breach of fiduciary duties are to be brought in derivative suits.").

[15] *McWhorter*, 312 Ga. App. at 816 (1) (punctuation omitted); *accord Crittenton*, 312 Ga. App. at 524 (2).

*circumstances show that the reasons for the general rule requiring a derivative suit do not apply."*[16] The reasons for ordinarily requiring derivative actions are:

> (1) to prevent multiple suits by shareholders; (2) to protect corporate creditors by ensuring that the recovery goes to the corporation; (3) to protect the interest of all the shareholders by ensuring that the recovery goes to the corporation, rather than allowing recovery by one or a few shareholders to the prejudice of others; and (4) to adequately compensate injured shareholders by increasing their share values.[17]

In its order denying summary judgment, the trial court found that the allegedly fraudulent misstatements or omissions of material fact were made only to Deerfield's shareholders, Rajendra and Savan, and not to any of the other shareholders of Southeastern, such that it could not say as a matter of law that there was no special injury to Deerfield. Furthermore, even if Deerfield had not alleged a special injury, the trial court found that the defendants had not shown the reasons for a derivative action were applicable here. Specifically, the nonparty shareholders are either related to Milan and Umang or have close relationships with them and suggested, in their

---

[16] *McWhorter*, 312 Ga. App. at 816-17 (1) (punctuation omitted); *accord Barnett*, 306 Ga. App. at 153 (3) (b).

[17] *McWhorter*, 312 Ga. App. at 817 (1); *accord Barnett*, 306 Ga. App. at 153 (3) (b).

12

depositions, that they would not pursue a lawsuit against the defendants. With regard to the third reason for a derivative action, the court noted that the plaintiffs are only seeking "Deerfield's 50 [percent] share of the damages" and the other nonparty shareholders are "free to bring their own direct claims if they so choose."[18]

As an initial matter, we disagree with the trial court that any of the claims alleged a special injury to Deerfield separate and distinct from that suffered by the other nonparty shareholders. Contrary to Deerfield's argument, there was evidence that Milan and Umang failed to disclose the Olive Garden lease to some of the nonparty shareholders and their interest in SGP to at least one nonparty shareholder. But even if the defendants' wrongful acts were directed only toward Deerfield and its shareholders, *any injury* suffered by Deerfield as a result of Milan and Umang's sale of Southeastern's property to SGP at an undervalued price is the same as the injury

---

[18] The second and fourth reasons for requiring a derivative action are not at issue here as there is no evidence of any corporate creditors who need protection and, as a closely held corporation, there is no ready market for Southeastern's shares. *See Thomas v. Dickson*, 250 Ga. 772, 775 (301 SE2d 49) (1983) (noting that a derivative action would not adequately compensate a plaintiff because, "[f]or a shareholder, the potential benefit of a corporate recovery in such cases is the increase in the value of his or her shares . . . [but] in a closely held corporation, there is no ready market" for the shares).

13

suffered by the nonparty shareholders and Southeastern itself.[19] Notably, although

Sudhir and Rajesh own shares of SGP and DRP, the other nonparty shareholders,

including Rahul, Sunil Nair, and Chirag, do not. Thus, because Deerfield has not

alleged a special injury that was not suffered by these nonparty shareholders, it is

---

[19] *See Haskins v. Haskins*, 278 Ga. App. 514, 520 (1) (629 SE2d 504) (2006) (holding that a plaintiff did not suffer a separate and distinct injury from other shareholders based on a complaint that "his brother engaged in self-dealing and conversion by paying himself a dividend" because the impact of his brother's alleged actions would be on the value of the stock in general and not just to the plaintiff's shares). *See also Grace Bros. v. Farley Indus., Inc.*, 264 Ga. 817, 819 (2) (450 SE2d 814) (1994) ("[A] shareholder must be injured in a way which is different from the other shareholders or independently of the corporation to have standing to assert a direct action."); *Levy v. Reiner*, 290 Ga. App. 471, 473-74 (2) (659 SE2d 848) (2008) (holding that plaintiff could not maintain a direct action on a breach-of-fiduciary-duty claim against corporate directors and officers based on allegations that they paid themselves excessive salaries); *Matthews v. Tele-Sys., Inc.*, 240 Ga. App. 871, 872-74 (2) (525 SE2d 413) (1999) (holding that a breach-of-fiduciary duty claim, which essentially alleged that excessive salaries depleted or wasted corporate assets, could only be brought in a derivative action).

Deerfield argues that, under *Argentum Int'l, LLC v. Woods*, 280 Ga. App. 440, 447 (2) (e) (634 SE2d 195) (2006), fraudulent misrepresentations and omissions made to specific shareholders resulted in direct claims. But in that case, we held that the plaintiffs' "claims for fraud and conspiracy [were] personal to them[,]" such that they had alleged a special injury. *See id.* Here, in stark contrast, there was an identical injury to all shareholders, and at least one of the nonparty shareholders testified in his deposition as to misrepresentations and omissions made to him. Accordingly, *Argentum* is easily distinguishable.

14

required to bring its claims in a derivative action unless it can show that the reasons for the general rule requiring a derivative suit do not apply.[20]

Here, the trial court found that a direct action was permitted because the nonparty shareholders could bring their own direct actions, but this reasoning cannot support a direct action because, as explained *supra*, one of the reasons for requiring a derivative suit is to prevent multiple lawsuits.[21] And during his deposition, one of the nonparty shareholders said that, with regard to the lawsuit, he intended to possibly seek his own counsel. Moreover, in their affidavits,[22] Rahul, Sunil Nair, and Chirag averred that they had not ruled out the possibility of filing suit. Thus, even assuming that most of the nonparty shareholders would not sue Umang and Milan due to their

---

[20] *See supra* notes 16-17 & accompanying text.

[21] *See supra* note 17 & accompanying text; *Barnett*, 306 Ga. App. at 153-54 (3) (b) (holding that because all of corporation's shareholders were not parties to the lawsuit, risk of multiple lawsuits and possible prejudice to the other rights of other shareholders prohibited shareholder's direct action).

[22] Deerfield urges that Rahul, Sunil Nair, and Chirag's affidavits are a "farce" and that their deposition testimony makes clear that they are "aligned with" the defendants and have no intention of pursuing claims against them. But it is not our role to "sort through the evidence, resolve conflicts, and make findings of fact based on the evidence it finds credible." *Hardin*, 301 Ga. at 536 (punctuation omitted). Notably, although the plaintiffs filed a motion to strike the affidavits of Sunil Nair, Chirag, and Rahul, that motion was later withdrawn.

15

relationships with them, there is a *risk* that any one of them could file another action asserting the same claims at issue in this case.[23]

Finally, there are numerous Southeastern shareholders who are not parties to this litigation, but who could be prejudiced if damages are awarded solely to Deerfield, rather than to Southeastern. And if the possibility of prejudice to other interested parties, such as creditors or other shareholders exists, "a direct recovery should not be allowed."[24] And while the trial court found that all of the nonparty shareholders have close, personal relationships with Milan or Umang, there is no evidence that, if Deerfield's claims are successful, all of the nonparty shareholders

---

[23] *See Sw. Health & Wellness, LLC. v. Work*, 282 Ga. App. 619, 626-27 (2) (c) (639 SE2d 570) (2006) (holding that the plaintiff shareholders must bring a derivative action when they alleged that the nonparty shareholders were given the opportunity to participate in the lawsuit and chose not to, but there was no evidence to support that argument in the record, and thus, plaintiffs could not show that there was no danger of multiple lawsuits). *But see Parks v. Multimedia Techs., Inc.*, 239 Ga. App. 282, 287-88 (2) (520 SE2d 517) (1999) (holding that sole injured shareholder was permitted to bring direct action when there was no risk of multiple suits because only other shareholders were defendant's wife and children).

[24] *Thomas*, 250 Ga. at 775; *accord Matthews*, 240 Ga. App. at 873 (2) ("If the corporation has . . . other shareholders who would be prejudiced if the misappropriated funds were not returned to the corporation, then a direct action must fail."). *But see Thomas*, 250 Ga. at 775 (holding that *sole* injured shareholder was permitted to bring a direct action when the reasons for a derivative action did not exist).

have consented to the resulting damages being paid only to Deerfield, rather than to Southeastern for the benefit of all its shareholders—including those who, like Deerfield, have no interest in SGP and DRP.[25] Indeed, one of the nonparty shareholders testified that he did not wish to be left out of any recovery of damages if the property had been sold for less than its value.

In sum, the trial court erred in finding that Deerfield's claims could be brought directly because Deerfield (1) has not alleged a special injury not suffered by the other nonparty shareholders and Southeastern, and (2) cannot show that none of the reasons for requiring a derivative suit apply.[26]

---

[25] *See Rollins v. LOR, Inc.*, __ Ga. App. __ (4) (__ SE2d __) 2018 WL 2295758, at *15 (2018) (noting that "although the trial court found that all of the non-party shareholders have consented to and benefitted from the breaches of fiduciary duty alleged in the complaint, there is no evidence that, if the [plaintiffs'] claims are successful, the non-party shareholders have consented to the resulting damages being paid only to the [plaintiffs], rather than to [the corporation] for the benefit of all the shareholders"); *Levy*, 290 Ga. App. at 474 (2) (holding that, although the appellant contended that other shareholders were unlikely to bring additional claims because they benefitted from the alleged wrongful conduct, there was no evidence in the record to support that assertion). *Cf. Parks*, 239 Ga. App. at 287-88 (2) (holding that because plaintiff was the sole injured shareholder, there was no concern about prejudicing other shareholders).

[26] *See McWhorter*, 312 Ga. App. at 816-17 (1) (holding that the plaintiff shareholders could not bring a direct action when one of the reasons for requiring derivative actions applied, which was to protect corporate creditors); *Levy*, 290 Ga. App. at 474 (2) (holding that the plaintiff shareholders must bring a derivative action

17

For all these reasons, the trial court's order denying summary judgment is reversed.

*Judgment reversed. Doyle, P. J., and Mercier, J., concur.*

---

when one of the reasons for requiring a derivative action applied, which was to prevent multiple lawsuits); *Work*, 282 Ga. App. at 626-27 (2) (c) (same).

*Appendix*



*DRP is not depicted due to its minor role in the proceedings