**FOURTH DIVISION**
**DILLARD, C. J.,**
**DOYLE, P. J., and MERCIER, J.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**May 21, 2018**

# In the Court of Appeals of Georgia

A18A0638. ROLLINS et al. v. LOR, INC., et al.

A18A0668. LOR, INC., et al. v. ROLLINS et al.

DILLARD, Chief Judge.

These consolidated appeals involve various interfamilial disputes over the alleged mismanagement of a family business associated with a large estate. Specifically, Gary Rollins's four children, who are trustees of a marital trust established solely for the benefit of their mother (collectively, the "trustees"), sued LOR, Incorporated ("LOR"); their father, Gary; and their uncle, Randall Rollins (collectively, the "LOR Defendants"). The trustees asserted several claims on behalf of the trust, which is a minority shareholder of LOR, including, *inter alia*, that Gary and Randall breached their fiduciary duties to the trust in myriad ways, improperly converted trust assets to their own use, committed corporate waste, and engaged in

self-dealing. The LOR Defendants moved for summary judgment, and the trial court granted the motion as to the majority of the trustees' claims, finding that they were time-barred or should have been brought in a derivative action, but denied it as to the remaining claims.

In Case No. A18A0638, the primary appeal, the trustees argue that the trial court (1) erroneously found that the statute of limitation as to several of their claims was not tolled by fraudulent concealment; (2) misapplied a prior decision of this Court in a related case[1] in rejecting their challenge to LOR's dividend policies; and (3) erred in granting summary judgment as to their breach-of-fiduciary-duty claim related to the creation and distribution policies of certain partnerships, which decreased the dividends distributed to the marital trust.

And in Case No. A18A0668, the cross-appeal, the LOR Defendants argue that the trial court erred in finding that (1) absent the time-bar, the trustees' breach-of-fiduciary-duty claim regarding the aforementioned partnerships could survive summary judgment; (2) the trustees' theory of damages as to some of their claims was

---

[1] *See Rollins v. Rollins*, 338 Ga. App. 308 (790 SE2d 157) (2016) (physical precedent only) ("*Rollins V*"). *Rollins V* was the fifth appellate decision in an earlier case involving the same parties in different capacities and different Rollins family trusts, which "continues to wend its way between our appellate courts." *Id.* at 309.

not too speculative to be decided by a jury; (3) the trustees could, on behalf of the trust, bring direct claims for alleged mismanagement of LOR and corporate waste; (4) the trustees' claims were not barred by a release signed by their mother, the sole beneficiary of the trust; and (5) the trustees' claims that Gary and Randall's personal use of certain LOR assets was unfair to the corporation could be brought as direct claims and were not barred by the aforementioned release.

For the reasons set forth *infra*, we affirm in the primary appeal and reverse in the cross-appeal.

*Creation and Structure of LOR*

The factual background necessary to understand this case is lengthy and involves decades of estate-planning and business decisions related to various Rollins family entities and trusts. But in relevant part, and viewing the evidence in the light most favorable to the trustees (*i.e.*, the nonmoving parties),[2] the record establishes that the four appellant trustees in this case are the children of Gary and Ruth Rollins: Glen Rollins, Ruth "Ellen" Rollins, Nancy Rollins, and O. Wayne Rollins, II. In 1978,

---

[2] *See, e.g.*, *Vratsinas Constr. Co. v. Chitwood*, 314 Ga. App. 357, 357-58 (723 SE2d 740) (2012).

3

Gary and Randall's father (and the trustees' grandfather), O. Wayne Rollins, Sr.,[3] founded LOR as a way to manage the family's wealth. Then, in 1986, O. Wayne elected for LOR to be taxed as a closely-held "S-corporation," which meant that it would not be subjected to federal income taxes, and instead, those taxes would pass through to LOR's shareholders. When O. Wayne made this election, he also set up nine "Qualified S-trusts" to hold stock in LOR for the benefit of each of his grandchildren, and Gary was the trustee for each of his children's S-trusts. Under the terms of the S-trusts, the assets of each trust were to be distributed to its beneficiary when each grandchild turned 45 years old, but until then, LOR's non-voting stock was held by O. Wayne, Gary, Randall, and the nine S-trusts collectively.

Initially, O. Wayne held the majority of the voting stock, while his sons, Gary and Randall, were minority shareholders. But when O. Wayne died in 1991, his LOR stock passed to Gary and Randall, and since that time, they have possessed all of the LOR voting stock and have had sole control of the corporation. Also, upon O. Wayne's death, Randall became president of LOR, Gary became vice president, and Joe Young, who served as secretary-treasurer of LOR, was appointed to become the

_____

[3] For the sake of clarity, the elder O. Wayne Rollins is referred to herein as "O. Wayne," while the younger, one of the trustees, is referred to as "Wayne."

4

third member of LOR's board of directors. Years later, when Young resigned, Donald Carson became president of the Rollins family office and replaced Young as the third LOR board member.

*The 1993 Gary W. Rollins Marital Trust*

In 1993, after consultation with their attorneys and Glenn Grove, a senior LOR official, Gary and Randall initiated the Rollins Family Capital Preservation Plan (the "capital plan"), which included a series of estate-planning transactions. As part of the capital plan, Gary transferred a lifetime interest in his LOR non-voting stock (*i.e.*, 56,507 shares) to the newly created 1993 Gary W. Rollins Marital Trust (the "marital trust"), an irrevocable trust for the sole benefit of his wife, Ruth, with their children designated as the trustees. During her life, Ruth was to be the sole beneficiary of the marital trust, and under its terms, Gary had no right to or interest in any of the trust property. Further, the marital trust was established as a grantor trust, which means that Gary was the grantor and was liable for any taxes on the trust's income. Notwithstanding those provisions, in January and March 1995, Gary transferred a total of $5,675,000 from the marital trust's bank account into his personal account. Additionally, on various occasions between 2001 and 2008, a total of $8,336,311 in dividends declared by LOR and owed to the marital trust were used to pay taxes

5

directly to the Internal Revenue Services rather than to the trust.[4] Since 1993, the marital trust has held approximately 18.3 percent of LOR's outstanding non-voting stock, which Gary previously held individually, and the trust's only income is the payout of dividends distributed to it by LOR.

In December 1993, Gary held a family meeting with Ruth and their children, at which Grove informed them of the new capital plan, but neither Gary nor Grove explained any of the transactions in detail. Instead, the trustees were simply told that Gary and Grove "had planned some transactions for the family involving trusts for which [Gary] would serve as [the] trustee during his lifetime and [Glen] and [his] siblings . . . would serve as trustees thereafter." Gary and Grove "seemed excited and happy about the transactions[,]" which gave the trustees "the impression that the transactions were a good thing for the family." At some point following the meeting, the trustees, at Gary's request, signed a series of blank, unnumbered signature pages,

---

[4] Ruth averred that she was never given a copy of the trust documents, and she never consented to trust income being used to pay taxes. And some of the IRS tax forms executed by Glen on behalf of the marital trust also contained the following notice: "UNDER THE TERMS OF THE TRUST INSTRUMENT, THIS IS A GRANTOR TRUST. ALL INCOME IS TAXABLE TO THE GRANTOR AS SET FORTH UNDER APPLICABLE STATE LAW." Nevertheless, Gary averred that he told Ruth that the income received by the marital trust would be used to pay their joint tax liabilities associated with the LOR shares held by the marital trust, and he contends that she agreed.

6

which included only a signature line with their names followed by the designation "Trustee" or "Grantor" without indicating to what document or entity the signature page related. The trustees either did not review or could not remember reviewing the trust documents before signing the signature pages, but in any event, those signature pages were later appended to the corresponding trust instruments.[5] This was not necessarily unusual because, from time to time over the years, Gary or the Rollins family office asked the trustees to sign signature pages without giving them the full documents to review.

In signing the 1993 trust documents, the trustees relied on their father's representation that he would serve as the trustee of the marital trust until his death, at which point they would become the trustees. And thereafter, whenever the trustees were asked to sign documents related to the marital trust, they were told that their signatures were needed "for administrative purposes without any explanation of the documents or transactions and that [their] father was taking care of the marital trust."

---

[5] In his 2016 affidavit submitted as evidence in this case, Glen averred that he was not given the 1993 trust documents to review or keep at the time when he signed the signature pages for three different family trusts and that he did not understand that he was a trustee of the marital trust. But he testified in an earlier 2010 deposition during the *Rollins V* litigation that he *was* given a copy of the 1993 trust documents and he "skimmed them," but "[he] listened most to what [his] father told [him]."

7

Additionally, although Glen maintains that he was unaware that he was a trustee of the marital trust, he signed the trust's tax returns every year from 1995 until 2009 above the designation "signature of fiduciary," without questioning why he was being asked to do so. According to Glen, he signed the tax returns because he had "a relationship of trust and confidence with [his] father and the Rollins family office," and he continued to rely on Gary's representations that he would not actually become a trustee of the marital trust until Gary passed away but that his signature was nevertheless needed for administrative purposes.

*The Shareholder Agreements*

On February 19, 1994, the trustees each signed the signature page for the "1994 Master Custody Agreement," above the denomination "trustee" and below the account name, "THE 1993 GARY W. ROLLINS MARITAL TRUST." The 1994 agreement established a custodial account for the marital trust with The Northern Trust Company and provided that all communications regarding the account be sent to LOR, rather than the trustees. Thereafter, Grove, as an officer of LOR, consulted Gary, rather than the trustees or Ruth, in determining the distributions to be paid to Ruth from the trust. Indeed, the marital trust was administered through Gary and the family office without any consultation with the trustees, but Gary continued to assure

8

them that he was "taking care" of the trust.[6] While the trustees do not specifically recall signing the 1994 Master Custody Agreement, they concede that they may have signed a signature page, which was later attached to the agreement. But the trustees stated that, if they did sign the signature page, they did not know that they were doing so in their capacities as trustees of the marital trust because, at the time, they were still relying on their father's representation that he was the trustee.

On April 15, 1996, the trustees signed another signature page, which was later appended to the "1996 Shareholder Agreement," in which they consented to the amendment of LOR's articles of incorporation. Each trustee signed above the title "co-trustee" and directly under (and on the same page with) the heading, "THE 1993 GARY W. ROLLINS MARITAL TRUST." But the trustees were not given an opportunity to read the agreement, and at the time, they were still unaware that they were trustees of the marital trust. Then, on November 8, 1999, each of the trustees, except for Wayne, signed yet another LOR shareholder agreement underneath and on the same page with the heading, "THE 1993 GARY W. ROLLINS MARITAL

---

[6] Gary does not dispute that, before the trustees eventually took over the administration of the marital trust in 2010, Grove was primarily responsible for carrying out and overseeing matters relating to the administration of the marital trust, but Gary suggests that Grove did so on behalf of the trustees with their permission.

9

TRUST" and above the title "Trustee." As with the 1996 Shareholder Agreement, the trustees were not given the 1999 Shareholder Agreement to review, and in signing the signature page, they continued to rely on their father's representation that he would be the trustee of the marital trust until his death.

*The RFPS Investment Partnerships*

In 2002, Gary, Randall, and Grove began planning the formation of three new partnerships to hold stock in various Rollins public companies, which had previously been held by LOR, as well as other Rollins family entities, members, and trusts. These partnerships would become known as the "RFPS Investment Partnerships," and they were purportedly created to prevent certain tax penalties from being imposed on LOR. The RFPS Investment Partnerships had a two-class partnership structure, with LOR among a small class of common partners, and other Rollins family entities, family members, and trusts participating as preferred partners. Each member of the Rollins family was given the option to become a preferred partner in the RFPS Investment Partnerships, which allegedly would allow them to receive higher distributions than the dividends they had been receiving from the Rollins public companies. In exchange, the preferred partners would forgo the increase in value of the Rollins public companies' stock over time.

One of the key terms of the RFPS Investment Partnerships was that the preferred partners would receive 99 percent of the annual distributions and the common partners, such as LOR, would receive the remaining 1 percent until the preferred partners reached a specified "Annual Preferred Target." Instead of the high allocation of income received by the preferred partners, common partners would allegedly have the potential to realize certain tax-deferral benefits and the benefit of long-term capital appreciation. Although the trustees were not given much information about the RFPS Investment Partnerships, they were told that their father believed that the formation of these partnerships would result in tax advantages. Ultimately, as to the trustees, Nancy and Wayne elected to become preferred partners, but Glen and Ellen did not.

LOR Investment Company ("LORIC"), which is controlled by Gary and Randall, determines how much money the RFPS Investment Partnerships distributes to their partners. The trustees were given an interest in LORIC, and at some point, the Rollins family office asked them to sign paperwork confirming their agreement to the distribution decisions Gary and Randall would make in their management of LORIC. The trustees agreed, and in March 2005, even though they did not understand what LORIC was or how the RFPS Investment Partnerships' distribution scheme worked,

they signed three resolutions consenting to Gary and Randall's distribution decisions. In the "mid 2000s," around the same time that LORIC established its distribution policies, Gary, Randall, and Carson (as LOR's board of directors) set the LOR dividend distributions at a fixed rate of $2 million per year, rather than calculating a fluctuating amount every year based on LOR's performance or capital needs because "it was decided that the [m]arital [t]rust would get $360,000 a year."

*The Trustees' Loss of Confidence in Gary and Randall*

At a Rollins family meeting on August 10, 2010, Gary and Randall presented a plan to change the legal structure of various Rollins family entities and trusts, and they asked the trustees to sign documents to approve the new plan. Although Gary and Randall insisted that the trustees sign the documents while at the meeting, the trustees felt uncomfortable with the proposal and refused to sign any documents before obtaining additional information. In response, Gary and Randall threatened to cease distributions to the trustees from various Rollins family entities if they did not sign the documents. When the trustees still refused to comply, Gary and Randall stated that they would implement the plan without the trustees' approval, which "did not seem right" to them. As a result of this meeting, the trustees lost confidence in Gary, Randall, and the Rollins family office, and began to believe that Gary and

12

Randall were acting in their own self-interest, rather than in the best interest of the trustees.

Then, on August 23, 2010, the appellant trustees, in their individual capacities, sued Gary and Randall, individually and as trustees, for an accounting of the S-trusts, for which the trustees were the beneficiaries (the "Children's Trusts litigation"). In retaliation, Gary and Randall ceased distributions to the trustees from various family entities as well as distributions from their S-trusts. Around the same time, Gary also ceased acting as the trustee for the "1993 trusts," and on December 8, 2010, Carson sent an e-mail to the trustees, informing them for the first time that they were the current trustees of the marital trust. Upon learning this information, the trustees began controlling and administering the marital trust.

To that end, the trustees consulted their attorneys and hired accountants, who began gathering information to help them administer the marital trust and "make sense of the web of family entities in which [they] had an interest." It was during this information-gathering process the trustees discovered, *inter alia*, that the sole source of the marital trust's income is the dividend payments it receives as a shareholder of LOR, which totaled approximately $360,000 per year and was distributed to Ruth in $30,000 monthly payments. And based on financial information that Glen received

during the Children's Trusts litigation, he also learned that the dividends being paid by LOR to the marital trust were "quite low in comparison to the value of LOR's assets or to LOR's total net income." Further, certain financial statements made Glen concerned that Gary and Randall might have engaged in self-dealing transactions while in control of LOR.

*Personal Use of LOR Assets*

As discovery in the Children's Trusts litigation ensued, the trustees learned that various cattle ranches, which they had always believed to be personally owned by either Gary or Randall, were actually owned by LOR. Gary and Randall "always referred to the ranches as theirs, and [the trustees] never had any reason to believe otherwise." Although there are cattle operations on some of the ranches, the trustees' understanding is that the ranches generally were not profitable. The trustees also learned that Gary and Randall have leases for some of the acreage on the LOR ranch properties, for which they paid only nominal amounts of money. Unlike Gary and Randall, the trustees were never given the opportunity to lease property from LOR at similarly low rates. And since filing the 2010 Children's Trusts lawsuit, the trustees have not been permitted to use the ranch properties.

Additionally, as far back as the trustees can remember, Gary and Randall flew by private plane, and they referred to the particular plane each primarily used as "Gary's plane" and "Randall's plane," respectively. But documents produced during the Children's Trusts litigation revealed that "Randall's plane" was actually owned by LOR, and "Gary's plane" was owned by another family business. According to Gary and Randall, they paid $1,000 per hour for private use of these corporate planes, and they have always considered their personal use of LOR's plane as compensation for the services they provide to LOR. Also during the 2010 litigation, the trustees discovered that LOR owned a customized luxury bus, which had been purchased in the mid-2000s. The trustees were aware that the bus had been purchased, but at the time, they were told that Randall owned it, and they are currently unaware of it ever being used for any business purpose.

On July 25, 2014, the trustees filed the instant action on behalf of the marital trust, alleging several claims against Gary, Randall, and LOR. Specifically, as to LOR, the trustees asserted a shareholder demand for inspection of corporate records (Count I), as well as claims for failure to pay dividends declared and owed (Count IV) and for dissolution (Count VI). The complaint also alleged claims against only Gary for conversion/money had and received (Count III) and unjust enrichment (Count V).

15

And as to both Gary and Randall, the trustees alleged that they breached their fiduciary duties to the marital trust in several ways (Count II).

Subsequently, the LOR Defendants filed a motion to dismiss the complaint and for a judgment on the pleadings as to all claims except the claim for inspection of corporate records, arguing, *inter alia*, that some of the trustees' claims were derivative and could not be brought in a direct action and that other claims were barred by Ruth and Gary's 2013 divorce-settlement agreement. But following further briefing from the parties, the trial court denied the motion. Discovery ensued, and on April 26, 2016, the LOR Defendants filed a motion for summary judgment as to all counts of the complaint, arguing, *inter alia*, that most of the claims were time-barred and all of the claims are derivative. Following the trustees' response and a hearing, the trial court granted the motion in part and denied it in part. These cross-appeals follow.

Summary judgment is, of course, proper when "there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law."[7] Additionally, a *de novo* standard of review applies to an appeal from a grant or denial of summary judgment, and "we view the evidence, and all reasonable conclusions and inferences

---

[7] *Vratsinas Constr. Co.*, 314 Ga. App. at 357 (punctuation omitted).

16

drawn from it, in the light most favorable to the nonmovant."[8] With these guiding principles in mind, we turn now to the parties' specific claims of error.

*Case No. A18A0638*

1. In the main appeal, the trustees first argue that the trial court erroneously found that the statute of limitation for many of their claims was not tolled by Gary and Randall's fraudulent concealment of the information giving rise to those claims. We disagree.

To begin with, the trustees have not argued, either below or on appeal, that the trial court erred in applying a four-year statute of limitation to the claims at issue (*i.e.*, breach of fiduciary duty, conversion, failure to pay dividends declared and owed, and unjust enrichment). Consequently, we need not address the propriety of the trial court's ruling in this regard.[9] Nevertheless, we note that claims for conversion and unjust enrichment are subject to a four-year limitation period under OCGA § 9-3-32

---

[8] *Id.* at 357-58 (punctuation omitted).

[9] *See* Court of Appeals Rule 25 (c) (2) ("Any enumeration of error that is not supported in the brief by citation of authority or argument may be deemed abandoned").

17

and OCGA § 9-3-26, respectively.[10] Furthermore, in Georgia there is "no specific statute of limitation for breach of fiduciary duty claims[,] [and] [i]nstead, we examine the injury alleged and the conduct giving rise to the claim to determine the appropriate statute of limitation."[11] But here, the trial court correctly applied a four-year statute of limitation to each of the trustees' breach-of-fiduciary-duty claims because each claim alleged that the marital trust, as a shareholder of LOR, suffered economic losses as a result of the breach. Indeed, under OCGA § 9-3-31, a four-year statute of limitation applies when the claim alleges injuries to personalty.[12] Similarly,

---

[10] *See* OCGA § 9-3-26 ("All other actions upon contracts express or implied not otherwise provided for shall be brought within four years from the accrual of the right of action."); OCGA § 9-3-32 ("Actions for the recovery of personal property, or for damages for the conversion or destruction of the same, shall be brought within four years after the right of action accrues. . . ."); *Engram v. Engram*, 265 Ga. 804, 806 (2) (463 SE2d 12) (1995) (acknowledging that a four-year limitation period applies to claims for unjust enrichment and citing OCGA § 9-3-26); *Walker v. Oglethorpe Power Corp.*, 341 Ga. App. 647, 664 (3) and n.63 (802 SE2d 643) (2017) (holding that a claim for conversion is subject to a four-year statute of limitation and citing OCGA § 9-3-32).

[11] *Godwin v. Mizpah Farms, LLLP*, 330 Ga. App. 31, 38 (3) (b) (766 SE2d 497) (2014); *accord Niloy & Rohan, LLC v. Sechler*, 335 Ga. App. 507, 512 (2) (782 SE2d 293) (2016).

[12] *See* OCGA § 9-3-31 ("Actions for injuries to personalty shall be brought within four years after the right of action accrues."); *Kothari v. Patel*, 262 Ga. App. 168, 174 (3) (585 SE2d 97) (2003) (applying the four-year statute of limitation set forth in OCGA § 9-3-31 to a shareholder's breach-of-fiduciary-duty claims when he

18

the trustees' claim for failure to pay dividends declared and owed is subject to a four-year statute of limitation under OCGA § 9-3-31, as it also alleges an economic loss.[13]

As previously noted, the trustees filed their complaint on July 25, 2014, which means that each cause of action that accrued prior to July 25, 2010, is time-barred.[14] Nevertheless, the trustees argue that the statute of limitation for their claims[15] was tolled until sometime after August 10, 2010, by Gary and Randall's fraudulent concealment of the appellant trustees' status as trustees of the marital trust, as well

alleged an economic loss).

[13] *See Averill v. Akin*, 219 Ga. App. 32, 32-34 (1) (463 SE2d 730) (1995) (noting that it was undisputed that a four-year statute of limitation applied to an action in which a shareholder sued a corporate director and the estate of a deceased director, alleging that they misappropriated funds and deprived the shareholder of dividend payments); *Mikart, Inc. v. Marquez*, 211 Ga. App. 209, 211-12 (5) (438 SE2d 633) (1993) (holding that a shareholder's claim to disputed shares was "time barred by the four-year statute of limitation applicable to actions for the recovery of personal property, damages for the conversion or destruction of such property, or for injuries to personalty").

[14] *See Godwin*, 330 Ga. App. at 35 (3) ("[I]t has been long recognized and is well established that a statute of limitation begins to run on the date a cause of action on a claim accrues. In other words, the period within which a suit may be brought is measured from the date upon which the plaintiff could have successfully maintained the action." (punctuation omitted)).

[15] Although three statutes of limitation are at issue in this appeal, for ease of reference, we refer to a single four-year statute of limitation applicable to all of the claims delineated *supra*.

19

as by the concealment of the various fraudulent acts underlying each of their claims.[16]

In this regard, OCGA § 9-3-96 provides that "[i]f the defendant[s] . . . are guilty of a fraud by which the plaintiff has been debarred or deterred from bringing an action, the period of limitation shall run only from the time of the plaintiff's discovery of the fraud." And to toll the statute of limitation under this statute, a plaintiff must show that: "(1) a defendant committed actual fraud;[17] (2) the fraud concealed the cause of action from the plaintiff; and (3) the plaintiff exercised reasonable diligence to

---

[16] In their brief, the trustees do not provide any particular date on which they allege the statute of limitation began to run as to each individual claim, but they contend that their duty to exercise reasonable diligence to discover their claims was "triggered," at the earliest, on August 10, 2010, when they lost trust and confidence in Gary and Randall. They further contend that the LOR Defendants' fraud continued until sometime in 2010, enabling them to conceal their wrongful acts in administering the marital trust. Before the trial court, the trustees alleged that they did not discover their role as trustees of the marital trust until December 8, 2010, and that they did not discover the LOR Defendants' fraudulent conduct until sometime in February 2013, during the course of exercising their fiduciary duties as trustees. As explained *infra*, when a statute of limitation is tolled by fraudulent concealment, the period of limitation runs from the time the plaintiff discovers the fraud, which, based on these allegations, would be December 8, 2010, and some time in February 2013. *See* OCGA § 9-3-96. And both of those dates are within four years of when the trustees' filed their complaint in July 2014.

[17] *See Lehman v. Keller*, 297 Ga. App. 371, 372-73 (1) (677 SE2d 415) (2009) ("The tort of fraud has five elements: (1) a false representation or omission of a material fact; (2) scienter; (3) intention to induce the party claiming fraud to act or refrain from acting; (4) justifiable reliance; and (5) damages." (punctuation omitted)).

20

discover the cause of action despite her failure to do so within the statute of limitation."[18] Further, a plaintiff bringing an action for fraud has "the burden of showing the existence of facts that would toll the statute of limitation."[19]

In considering what actions will toll the running of a limitation period, the Supreme Court of Georgia has "distinguished between cases where the underlying claim is actual fraud, and cases where the underlying claim is something other than fraud."[20] When the gravamen of the underlying complaint is actual fraud, "the limitation period is tolled until such fraud is discovered, or could have been discovered by the exercise of ordinary care and diligence."[21] On the other hand, when the gravamen of the underlying action is not a claim of fraud, the statute of limitation is tolled only upon a showing of "a separate independent actual fraud involving moral

---

[18] *Robertson v. Robertson*, 333 Ga. App. 864, 868 (1) (778 SE2d 6) (2015) (footnote omitted); *accord Daniel v. Amicalola Elec. Membership Corp*., 289 Ga. 437, 445 (5) (b) (711 SE2d 709) (2011).

[19] *Robertson*, 333 Ga. App. at 868 (1) (punctuation omitted); *accord Falanga v. Kirschner & Venker, P.C.,* 286 Ga. App. 92, 94 (1) (a) (648 SE2d 690) (2007).

[20] *Hunter, Maclean, Exley & Dunn, P.C. v. Frame*, 269 Ga. 844, 846-47 (1) (507 SE2d 411) (1998).

[21] *Id.* at 847 (1) (punctuation omitted); *accord Hamburger v. PFM Capital Mgmt., Inc*., 286 Ga. App. 382, 388 (4) (649 SE2d 779) (2007).

turpitude which deters a plaintiff from filing suit."[22] Additionally, when the complaint does not allege actual fraud,

> before the running of the limitation period will toll, it must be shown that the defendant concealed information by an intentional act—something more than a mere failure, with fraudulent intent, to disclose such conduct, unless there is on the party committing such wrong a duty to make a disclosure thereof by reason of facts and circumstances, or the existence between the parties of a confidential relationship.[23]

Nevertheless, because the existence of a confidential relationship between the parties "does not affect the *existence* of fraud—that is, the intention to conceal or deceive—a confidential relationship cannot, standing alone, toll the running of the statute."[24] Instead, a confidential relationship means only that "the plaintiff has cause

---

[22] *Frame*, 269 Ga. at 847 (1) (punctuation omitted); *accord Hamburger*, 286 Ga. App. at 388 (4).

[23] *Frame*, 269 Ga. at 847 (1) (punctuation omitted); *accord Hamburger*, 286 Ga. App. at 388 (4).

[24] *Frame*, 269 Ga. at 847 (1); *see Godwin*, 330 Ga. App. at 40 (3) (b) (noting that it is "well settled that a confidential relationship cannot, standing alone, toll the running of the statute [of limitation]"); *Mayfield v. Heiman*, 317 Ga. App. 322, 330 (4) (b) (730 SE2d 685) (2012) (same).

to rely upon, and place confidence in, the defendant."[25] Thus, the existence of such a relationship "affects only the *extent* of (a) the defendant's duty to reveal fraud, and (b) the plaintiff's corresponding obligation to discover the fraud for herself."[26] Put another way, when a confidential relationship exists, "a plaintiff does not have to exercise the degree of care to discover fraud that would otherwise be required, and a defendant is under a heightened duty to reveal fraud where it is known to exist."[27] But significantly, even when a confidential relationship exists, "the fraud itself—the defendant's intention to conceal or deceive—still must be established, as must the deterrence of a plaintiff from bringing suit."[28]

Turning to the case at hand, the trustees argue that the trial court erred in finding that (1) fraud was not the gravamen of their complaint, (2) there was no evidence of actual fraud or concealment, and (3) they did not exercise any due

---

[25] *Frame*, 269 Ga. at 847-48 (1); *accord Godwin*, 330 Ga. App. at 40 (3) (b).

[26] *Frame*, 269 Ga. at 848 (1); *accord Godwin*, 330 Ga. App. at 40-41 (3) (b).

[27] *Frame*, 269 Ga. at 848 (1); *accord Godwin*, 330 Ga. App. at 41 (3) (b).

[28] *Frame*, 269 Ga. at 848 (1); *accord Bryant v. Golden*, 302 Ga. App. 760, 762 (691 SE2d 672) (2010).

23

diligence to discover the purported fraudulent concealment of their claims.[29] But

pretermitting whether fraud was the gravamen of their complaint and assuming that

the parties had a confidential relationship, we agree with the trial court that the record

is devoid of any evidence that Gary and Randall prevented or deterred the trustees

from discovering their status as trustees of the marital trust or obtaining information

[29] The trial court described the time-barred claims in Counts II through V of the complaint as follows: (1) Gary and Randall breached their fiduciary duties to the marital trust by initiating the transactions that resulted in the RFPS Investment Partnerships, all of which occurred prior to 2005; (2) Gary and Randall breached their fiduciary duties to the marital trust by establishing, through LORIC, the RFPS Investment Partnerships' distribution policies at some time in 2005 or earlier; (3) Gary and Randall breached their fiduciary duties when they caused LOR to withdraw money from the marital trust account to pay Gary's personal tax liabilities at times between 2001 and 2008; (4) Gary and Randall breached their fiduciary duties and committed corporate waste when, at times prior to 1993, they each leased land from LOR on terms unduly favorable to them; (5) Gary and Randall breached their fiduciary duties by causing LOR to give them and other Rollins family entities below-market loans at times prior to July 25, 2010; (6) Gary was liable for conversion/money had and received based on withdrawals he made from the marital trust account in 1995; (7) LOR failed to pay dividends declared and owed to the marital trust at times between 2001 and 2008; and (8) Gary was unjustly enriched when, prior to July 25, 2010, he withdrew money from the marital trust account and when LOR diverted dividends intended for the marital trust to Gary's personal accounts. The trustees do not challenge the trial court's characterization of the foregoing claims or its findings as to when their causes of action accrued. Instead, they argue only that, as to *all* of their claims, the statute of limitation was tolled by Gary and Randall's alleged wrongful and deceitful conduct. Thus, we need not address the timeliness of each claim individually, but rather, whether the trial court erred in finding that, as a matter of law, the trustees could not establish fraudulent concealment.

24

that they were legally entitled to as trustees, or that the trustees exercised any level of diligence to do so.

(a) *Actual Fraud and Concealment.* The trustees, who have been trustees of the marital trust since it was created in 1993, contend not only that the LOR Defendants concealed from them that they were the trustees, but that Gary affirmatively lied to them when he repeatedly assured them that they were *not* the trustees. In support, the trustees claimed that when they signed signature pages on behalf of the trust, they were not given the corresponding documents to review. But Glen, the eldest Rollins sibling, testified in a 2010 deposition that he *was* given a copy of the original 1993 trust documents, and he at least "skimmed them."[30] And the opening paragraph of the trust instrument unambiguously provides that Gary is the grantor of the trust property, the appellant trustees are the trustees, and the trust would be known as "The 1993 Gary W. Rollins Marital Trust." Moreover, in many instances, even if the trustees

---

[30] In the instant litigation, Glen averred that he never had the opportunity to review the marital-trust instrument in detail and did not understand its terms. To the extent Glen provided contradictory testimony regarding whether he was given the marital-trust instrument to review in 1993, we note that "self-contradictory testimony is construed against a party-witness, absent a reasonable explanation for the contradiction." *Shiver v. Norfolk-S. Ry. Co.*, 269 Ga. 168, 169 (496 SE2d 903) (1998). The trustees have provided no such explanation for Glen's contradictory testimony in this regard.

25

were not given the corresponding trust documents for the initial signature page they were asked to sign, they subsequently signed several signature pages that designated them as trustees or co-trustees under the heading "THE 1993 GARY W. ROLLINS MARITAL TRUST" on the same page just above their signatures.[31] Thus, even if the trustees were unaware of *what* they were signing, they knew or certainly should have known that they were signing documents or agreements of some kind as trustees on behalf of the marital trust.

Additionally, between 1995 and 2009, Glen signed numerous tax returns on behalf of the marital trust above the designation "signature of fiduciary." In doing so, he declared—under *penalty of perjury*—that he had examined the returns, as well as any corresponding documents, and that, to the best of his knowledge, the information provided in those documents was accurate. Thus, regardless of any misrepresentations made by Gary, if Glen had viewed the tax returns, he would have seen that, at least according to the Georgia Department of Revenue and the United States Department of the Treasury, he and his siblings were the fiduciaries of record for the marital trust. And while Glen maintains that, at the time, he still believed Gary was the trustee, he

---

[31] At the time when the marital trust was created in 1993, the youngest of the four trustees was a 19-year-old college student and the oldest trustee had an established career as a regional manager for one of the family businesses.

26

concedes he never asked anyone why he was being asked to sign tax returns on behalf of the marital trust instead of Gary. According to Glen, he was given dozens of tax documents to sign every year, consisting of hundreds of pages, and he did not have the time to read them all. But regardless of whether Glen actually read the tax returns he signed, he swore under oath that he did review them, and given that the returns indicated he and his siblings were fiduciaries for the trust, we cannot say Gary and Randall *concealed* that information from him.

The trustees also argue that Gary and Randall concealed their numerous fraudulent acts giving rise to their claims. As we have explained, "[i]n cases of a confidential relationship, silence when one should speak, or failure to disclose what ought to be disclosed, is as much a fraud in law as is an actual false representation."[32] Nevertheless, a shareholder, like the marital trust, "is not entitled to negligently refuse to acquire knowledge that was open and available . . . through inspection of the

---

[32] *Vincent v. Bunch*, 240 Ga. App. 255, 257 (1) (522 SE2d 495) (1999); *accord Goldston v. Bank of Am. Corp.*, 259 Ga. App. 690, 694 (577 SE2d 864) (2003); *see Averill*, 219 Ga. App. at 33 (1) ("Generally where the defendant accused of fraud is a corporate officer occupying a fiduciary relationship with the shareholder, the 'mere silence' of that officer is sufficient to toll the statute.").

corporation's books and records."[33] Put another way, a shareholder cannot "turn a blind eye on information available to him."[34] And here, the signature pages and tax returns given to the appellant trustees disclosed that they were trustees of the marital trust, and as trustees, they were authorized to inspect the trust's accounts and to act on behalf of the trust as a shareholder of LOR. Furthermore, the trustees have pointed to no evidence that the LOR Defendants prevented them from obtaining any information they were legally entitled to in that capacity. Indeed, according to the trustees, they did not even know that they were the trustees of the marital trust, and as a result, they never requested any such information or took any actions on the trust's behalf.[35] Given these particular circumstances, the trial court did not err in

[33] *Averill*, 219 Ga. App. at 33 (1) (punctuation omitted); *see Manning v. Wills*, 193 Ga. 82, 89 (2) (17 SE2d 261) (1941) ("[A] shareholder can not negligently refuse to examine the facts available to him and still rescind the contract because the director failed to inform him of such facts. Whe[n] the opportunities for knowledge are equal, the stockholder takes the consequences of failing to inform himself."); *Jung v. Cheoun*, 216 Ga. App. 490, 492 (455 SE2d 310) (1995) ("One failing to inform himself, but having equal opportunity of learning the truth, must suffer the consequences of his neglect.").

[34] *Averill*, 219 Ga. App. at 33 (1); *see Quinn v. Forsyth*, 116 Ga. App. 611, 619 (3) (158 SE2d 686) (1967) ("As is apparent from the language of the Georgia cases[,] a stockholder may not blindly rely on a director's representations.").

[35] The trustees do not dispute that, after they began acting in their capacities as trustees of the marital trust, they hired attorneys and accountants to assist them in

28

finding there is insufficient evidence to create a genuine issue of material fact

regarding whether the LOR Defendants committed actual fraud in an attempt to deter

the trustees from discovering their causes of action.[36]

---

their duties and were ultimately able to discover the information giving rise to their claims. *See Mayfield*, 317 Ga. App. at 328 (2) (rejecting trust beneficiaries' argument that their breach-of-fiduciary-duty claim was barred by fraudulent concealment when, *inter alia*, they pointed to no evidence that the trustee did anything to deter them from hiring an attorney or other professional advisor to review the documents at issue before signing them or that the trustee did anything to deter them from timely filing their suit); *Allen v. Columbus Bank & Tr. Co.*, 244 Ga. App. 271, 275-76 (1) (534 SE2d 917) (2000) (holding that there was insufficient evidence of fraud to toll the statute of limitation for a beneficiary's breach-of-fiduciary-duty claim arising from real-estate transactions when there was no evidence that the trustee deterred the beneficiary from hiring an independent auditor or forensic accountant to review the relevant documents or that any such action by the trustee deterred the beneficiary from filing her suit).

[36] *See Frame*, 269 Ga. at 847 (1) (holding that, even when a confidential relationship exists, "the fraud itself—the defendant's intention to conceal or deceive—still must be established, as must the plaintiff's deterrence from bringing suit"); *Godwin*, 330 Ga. App. at 41 (3) (b) (holding that the one general partner of a company could not show that another partner, who was also his son and with whom he had a confidential relationship, engaged in any acts of fraud when the record showed, *inter alia*, that the father signed documents and tax returns, which revealed the information pertinent to his claims); *Hamburger*, 286 Ga. App. at 389 (4) (holding that the record was devoid of any evidence of concealment or actual fraud on the part of the defendant when the plaintiff received regular statements, containing the information that formed the basis for her claim); *Allen*, 244 Ga. App. at 277 (1) (holding that there was no evidence of actual fraud when a beneficiary received, but did not read, regular statements that revealed the mismanagement she alleged in her complaint and noting that "[a] trust beneficiary cannot put it on the back burner, shove the statements in a drawer, sit on her rights, and then hope to bring a lawsuit

29

(b) *Due Diligence*. Even if the trustees could establish that the LOR Defendants committed actual fraud that concealed their claims, they have not presented any evidence they exercised the requisite level of diligence to discover their causes of action within the limitation period. Indeed, they have not identified *any efforts* they took to discover why they were being asked to sign numerous documents, including tax returns, on behalf of the marital trust if they were not, in fact, the trustees. The trustees essentially concede they made no such efforts, arguing instead that they had "no duty to anticipate or to watch for fraud" because they had a confidential relationship with Gary and Randall. They further contend that, unlike cases in which the trustees had "actual notice" of wrongdoing, their "diligence obligation was not triggered until their confidential relationship with [the LOR Defendants] ended in August 2010, at the earliest[,]" and that after the relationship ended, they acted diligently in investigating the trust and discovering their causes of action.

But again, as early as 1993 when Glen "skimmed" the trust instrument, the trustees had "actual notice" of wrongdoing—*i.e.*, that Gary lied to them by claiming to be the marital trust's only trustee. Moreover, even assuming they had a confidential relationship with Gary and Randall, the trustees are incorrect in suggesting that such

clearly outside the statute of limitation period" (punctuation omitted)).

a relationship eliminates any duty on their part to exercise diligence to discover their claims. As previously explained, while "the level of diligence required by the plaintiff in investigating the fraud is lessened where a confidential relationship exists, it is not entirely extinguished."[37] It is true, of course, that although "[o]ne signing a document has a duty to read it and is bound by the terms of a document he does not read, . . . a party to a confidential or fiduciary relationship may rely upon representations made by the other party."[38] But here, the trustees signed numerous agreements and tax returns on behalf of the marital trust over a span of at least 15 years, and they have identified two representations made by the LOR Defendants or the Rollins family office upon which they relied in doing so: (1) Gary's repeated assurances that he would be the trustee of the marital trust until his death; and (2) the trustees nevertheless needed to sign those documents for "administrative purposes."[39] Even

---

[37] *Smith v. SunTrust Bank*, 325 Ga. App. 531, 544 (2) (b) (754 SE2d 117) (2014) (punctuation omitted); *accord Mayfield*, 317 Ga. App. at 326 (2).

[38] *Godwin*, 330 Ga. App. at 37 (3) (a) (punctuation omitted); *see Cochran v. Murrah*, 235 Ga. 304, 305 (219 SE2d 421) (1975) ("[When] one who can read signs a contract without reading it, he is bound by the terms thereof, unless he can show . . . that a fiduciary or confidential relationship existed between the parties upon which he relied in not reading the contract.").

[39] As detailed *supra*, some of the documents the trustees signed in their capacity as trustees of the marital trust included: (1) the 1994 Master Custody

31

if the trustees were entitled to rely on those representations without reading the substance of the documents they signed, most, if not all, of the signature pages revealed that they *were* the trustees of the marital trust. Moreover, any representation that they needed to sign the documents for administrative purposes was not necessarily inaccurate or inconsistent with the duties of a trustee. Thus, while the trustees testified they were not given, did not understand, or did not read the documents they signed, they have not identified any false representations regarding the content of those documents upon which they relied when signing them above the designation "trustee."

In sum, we acknowledge that "issues concerning a plaintiff's diligence in discovering fraud usually must be resolved by the trier of fact, [but] this is not always

---

Agreement, which established a custody account at a bank for the marital trust and essentially authorized the Rollins family office to receive bank statements and administer the trust; (2) the 1996 Shareholder Agreement, in which they consented to amendments to LOR's articles of incorporation; (3) the 1999 Shareholder Agreement, which, *inter alia*, placed certain restrictions on the transfer of stock; (4) three resolutions consenting to Gary and Randall's decision making, through LORIC, as to the RFPS Investment Partnership's dividend-distribution scheme; and (5) numerous tax returns over more than a decade. Rather than identifying any particular misrepresentations made by the LOR Defendants regarding the *content* of these documents, the trustees each averred that, in general, they signed anything they were asked to sign because they relied upon and trusted their father, believing that he would act in their best interest.

the case."[40] When, as here, the trustees concede that, despite signing numerous documents as trustees of the marital trust, they made no attempt at all to obtain information they were legally entitled to in that capacity (and contend they had no duty to do so), the trial court did not err in finding that they failed to exercise even a minimal degree of due diligence to discover their claims as a matter of law.[41]

---

[40] *Mayfield*, 317 Ga. App. at 326 (2) (punctuation omitted); *accord Nash v. Ohio Nat'l. Life Ins. Co.*, 266 Ga. App. 416, 418 (1) (597 SE2d 512) (2004).

[41] *See Mayfield*, 317 Ga. App. at 328 (2) (holding that the statute of limitation for an action brought by trust beneficiaries against the trustee for mismanaging the trust was not tolled by fraudulent concealment when, as here, there was no evidence that the trustee "did anything to deter them from hiring an attorney or other professional advisor to review [certain] documents before they signed them or that [the trustee] took any action to deter them from timely filing their suit"); *Hendry v. Wells*, 286 Ga. App. 774, 780-81 (1) (650 SE2d 338) (2007) (holding that, even if the defendants, who were general partners in a real-estate investment partnership, sent plaintiffs, the limited partners, a series of communications that contained fraudulent statements normally sufficient to toll the limitation period, the limitation period was not tolled because the limited partners had "proper notice of the information necessary to determine the truth"); *Averill*, 219 Ga. App. at 33-34 (1) (holding that a shareholder could not establish that the statute of limitation period was tolled by fraudulent concealment when the defendant corporate officers did not disclose information regarding a rebate program when the shareholder had equal access to a ledger showing that rebates were being paid). *Cf. Goldston*, 259 Ga. App. at 693-95 (holding that the statute of limitation for a beneficiary's claims against a trustee was tolled by fraud when, *inter alia*, the beneficiary, who was a minor at the time the trust was created, was not even aware of the existence of the trust and the trustee failed to comply with its terms).

2. The trustees next argue that the trial court erred in finding that their breach-of-fiduciary-duty claim related to LOR's dividend-distribution policies was barred by this Court's decision in *Rollins V.* Although we agree that the trial court erred in this respect, the LOR Defendants are nevertheless entitled to summary judgment as to that claim.

In *Rollins V*, the trustees, as beneficiaries of their S-trusts, which, like the marital trust, are LOR shareholders, sued Gary and Randall, individually and as trustees of the S-trusts, asserting numerous claims, including that they breached their fiduciary duties by "failing to maximize income distributions."[42] And this Court held, in relevant part, that Gary and Randall did not breach their fiduciary duties by lowering the pro rata dividend distributions or by retaining earnings because they "had authority through the corporate bylaws to make those decisions."[43] The trial court found that our decision in *Rollins V* precluded the similar dividend-distribution claim brought by the trustees in this case.

Under the law of collateral estoppel, which is also sometimes called issue preclusion, parties are prevented from litigating an issue already litigated by the

[42] *Rollins V*, 338 Ga. App. at 308, 323 (3).

[43] *Id.* at 323 (3).

34

parties or those in their privies.[44] Further, collateral estoppel does not "require identity of the claim—so long as the issue was determined in the previous action and there is identity of the parties, that issue may not be re-litigated, even as part of a different claim."[45] And while the issue of whether Gary and Randall breached their fiduciary duties in establishing LOR's dividend policies is essentially the same in this case as it was in *Rollins V*, the trustees argue that the doctrine of collateral estoppel cannot apply because the parties in this case are not the same as or in privity with the parties in *Rollins V*. Specifically, in *Rollins V*, the trustees, as individual beneficiaries of their S-trusts, sued Gary in his capacity as trustee of those trusts, while in this case, the trustees, proceeding in their capacities as trustees of the marital trust, sued Gary and Randall as LOR's directors and controlling shareholders. In similar circumstances, we have held that there was no identity of parties or privity in the prior judgment, and thus, collateral estoppel did not preclude the plaintiff from litigating the same issue.[46]

---

[44] *See Ruth v. Herrmann*, 291 Ga. App. 399, 400 (1) (662 SE2d 726) (2008) ("Collateral estoppel, or issue preclusion, precludes the re-litigation of an issue that was previously litigated and decided on the merits in another action between the same parties or their privies.").

[45] *Id.* (punctuation omitted).

[46] *See Moore v. Dep't of Human Res.*, 220 Ga. App. 471, 472 (2) (469 SE2d 511) (1996) (holding that collateral estoppel did not bar the plaintiffs from pursuing

35

Essentially, in these different capacities, the trustees do not represent the same legal rights as they did in *Rollins V*.[47]

Nevertheless, this Court can affirm the trial court's grant of summary judgment to the LOR Defendants if it is right for any reason.[48] And here, it is undisputed that the most recent dividend-distribution decision made by Gary and Randall was in the "mid 2000s" when they decided to set the LOR dividend at a fixed rate of $2 million per year, rather than calculating a fluctuating amount every year based on LOR's performance or capital needs. Thus, because this alleged breach of fiduciary duty

---

a theory of negligence that had been rejected in a prior case because, although the plaintiffs had the opportunity to participate in the earlier suit, it was as representatives of their adopted son rather than as individuals); *Stiltjes v. Ridco Exterminating Co.*, 197 Ga. App. 852, 853 (399 SE2d 708) (1990) (holding that collateral estoppel did not bar the litigation of an issue because the plaintiff, currently acting in her fiduciary capacity, was a legally different person than she was in the prior case in which she acted in her individual capacity).

[47] *See U.S. Micro Corp. v. Atlantix Glob. Sys., LLC*, 278 Ga. App. 599, 602 (1) (630 SE2d 416) (2006) ("Although the parties to the prior action need not be identical, they must be so connected with a party to the judgment as to have such an identity of interest that the party to the judgment represented the same legal right." (punctuation omitted)).

[48] *See Hunt v. Thomas*, 296 Ga. App. 505, 508 (675 SE2d 256) (2009) ("A grant of summary judgment must be affirmed if right for any reason, whether stated or unstated. It is the grant itself that is to be reviewed for error, and not the analysis employed." (punctuation omitted)).

occurred prior to July 25, 2010, it is time-barred for the reasons set forth in Division 1 *supra*.

The trustees argue, however, that LOR's dividend-distribution policies are "a continuing wrong that occurs quarterly each time LOR declares an artificially low dividend." In this regard, we have held, at least in the context of beneficiaries bringing actions against a trustee, that "[a] cause of action for breach of fiduciary duty in the management of a trust . . . begins to run at the time the wrongful act accompanied by any appreciable damage occurs."[49] And in this matter, the trustees alleged that Gary and Randall breached their fiduciary duties by keeping the level of dividend distributions from LOR artificially low, and this purported "wrongful act" resulting in the lower dividend distributions occurred in the mid-2000s when Gary and Randall *fixed* the LOR dividend distribution at $2 million per year. We are unpersuaded that Gary and Randall took any new actions, wrongful or otherwise, with respect to the amount of the distribution on an ongoing quarterly basis. But in any event, for the reasons set forth in Division 4 *infra*, the trustees' claim regarding Gary

---

[49] *Allen*, 244 Ga. App. at 272 (1); *see Smith*, 325 Ga. App. at 545 (2) (b) (holding that each alleged improper income distribution by a bank to a trustee that harmed the beneficiaries constituted a separate cause of action for breach of fiduciary duty).

and Randall's dividend-distribution decisions is also derivative in nature and cannot be brought in a direct action.

3. Finally, the trustees contend that the trial court erred in finding that they were estopped from challenging the RFPS Investment Partnerships' distribution policies and that the safe harbor for conflicted-director transactions under OCGA §§ 14-2-861 and 14-2-862 applied to the transactions that created the RFPS Investment Partnerships. As to the trustees' breach-of-fiduciary-duty claims related to the RFPS Investment Partnerships transactions, which occurred in 2002 and 2003, and the establishment of the RFPS Investment Partnerships' distribution policies, which occurred in 2005 or earlier, the trial court found (and we agree) that those claims were time-barred. But in an effort to "provide a complete record," the trial court also concluded that, absent the time-bar, the trustees were estopped from challenging the RFPS Investment Partnerships' distribution policies because they approved of those policies as members of LORIC. The trial court also found, *inter alia*, that certain statutory safe-harbor provisions applied to the RFPS transactions because two independent directors, who were appointed in 2016, retroactively approved of the transactions. Because, as explained in Division 1 *supra*, we agree that the trustees' breach-of-fiduciary-duty claims related to the RFPS Investment Partnerships are time-

barred, we need not address whether the trial court erred in making these alternative findings.

*Case No. A18A0668*

4. Turning to the LOR Defendants' cross-appeal and addressing their third enumeration of error first, they argue that the trial court erred in finding that the trustees could pursue direct shareholder claims for alleged waste and mismanagement of LOR. We agree.

Although the trial court found that the vast majority of the trustees' claims were time-barred and that some of the claims must be brought in a derivative shareholders' action, the court also concluded that some of the claims were timely and could be brought directly. In relevant part, the trustees alleged that Gary and Randall breached their fiduciary duties to the marital trust through their exclusive and personal use of LOR assets, such as a corporate plane and luxury bus, without adequately compensating LOR. And the trial court determined that the trustees could maintain a direct action as to that claim because personal use of LOR assets was available to some shareholders and not others.

The trustees also alleged that Gary and Randall breached their fiduciary duties by making below-market loans from LOR to themselves and other Rollins family

39

entities. As to this claim, the trial court found that claims relating to loans made before July 25, 2010, were time-barred, but that the trustees could bring a direct action as to any loans made after that date. As for its reasoning, the trial court referred to a previous order, in which it determined that, under the circumstances of this case, there were no compelling reasons why the objectives of a derivative suit cannot be met with a direct action. In support, the court noted that there were no alleged creditors of LOR and the non-party shareholders, who were other Rollins family members, individually or through various trusts, have "affirmatively acquiesced in Gary and Randall's conduct in exchange for benefits not received by the [marital] [t]rust."

As we have previously explained, a derivative suit is "brought on behalf of a corporation for harm done to it and any damages recovered are paid to the corporation."[50] And the determination of whether a claim is derivative or direct is "made by looking to what the pleader alleged."[51] Indeed, it is "the nature of the wrong

---

[50] *Southland Propane, Inc. v. McWhorter*, 312 Ga. App. 812, 816 (1) (720 SE2d 270) (2011) (punctuation omitted); *accord Crittenton v. Southland Owners Ass'n, Inc.*, 312 Ga. App. 521, 524 (2) (718 SE2d 839) (2011).

[51] *McWhorter*, 312 Ga. App. at 816 (1) (punctuation omitted); *accord Phoenix Airline Servs., Inc. v. Metro Airlines, Inc.*, 260 Ga. 584, 585 (1) (397 SE2d 699) (1990).

40

alleged and not the pleader's designation or stated intention that controls the court's decision."[52] Furthermore, the general rule is that "allegations of misappropriation of corporate assets and breach of fiduciary duty can only be pursued in a shareholder derivative suit brought on behalf of the corporation, because the injury is to the corporation and its shareholders collectively."[53]

Although plaintiffs may bring direct actions for injuries done to them in their individual capacities by corporate fiduciaries, "our Supreme Court has held that to have standing to sue individually, rather than derivatively on behalf of the corporation, the plaintiff must allege more than an injury resulting from a wrong to the corporation."[54] Thus, to set out an individual action, the plaintiff "must allege either an injury which is separate and distinct from that suffered by other shareholders, or a wrong involving a contractual right of a shareholder which exists

---

[52] *McWhorter*, 312 Ga. App. at 816 (1) (punctuation omitted); *accord Phoenix Airline Servs., Inc.*, 260 Ga. at 585 (1).

[53] *McWhorter*, 312 Ga. App. at 816 (1) (punctuation omitted); *accord Barnett v. Fullard*, 306 Ga. App. 148, 152 (3) (a) (701 SE2d 608) (2010).

[54] *McWhorter*, 312 Ga. App. at 816 (1) (punctuation omitted); *accord Crittenton*, 312 Ga. App. at 524 (2).

41

independently of any right of the corporation."[55] That said, in the context of a closely-held corporation, a direct action may nevertheless be proper when "*the circumstances show that the reasons for the general rule requiring a derivative suit do not apply*."[56] The reasons for ordinarily requiring derivative actions are:

> (1) to prevent multiple suits by shareholders; (2) to protect corporate creditors by ensuring that the recovery goes to the corporation; (3) to protect the interest of all the shareholders by ensuring that the recovery goes to the corporation, rather than allowing recovery by one or a few shareholders to the prejudice of others; and (4) to adequately compensate injured shareholders by increasing their share values.[57]

As an initial matter, we disagree with the trial court that any of the aforementioned claims alleged a special injury to the marital trust separate and distinct from that suffered by the other non-party shareholders. While the trial court was correct that Gary and Randall's personal use of LOR assets without sufficient compensation benefitted some shareholders, but not others, any injury suffered by the

---

[55] *McWhorter*, 312 Ga. App. at 816 (1) (punctuation omitted); *accord Crittenton*, 312 Ga. App. at 524 (2).

[56] *McWhorter*, 312 Ga. App. at 816-17 (1) (punctuation omitted); *accord Barnett*, 306 Ga. App. at 153 (3) (a).

[57] *McWhorter*, 312 Ga. App. at 817 (1); *accord Barnett*, 306 Ga. App. at 153 (3) (a).

marital trust as a result of this misuse of LOR assets is the same as the injury suffered by the *non-party* shareholders and the corporation itself.[58] This is also true of any below-market loans that LOR made to Gary and Randall or other Rollins family entities and any actions they took to lower dividend distributions.[59] Because the

---

[58] *See Barnett*, 306 Ga. App. at 152 (3) (a) (holding that a shareholder failed to allege a special injury separate and distinct from that suffered by the corporation and other shareholders when his complaint alleged that the defendants had misappropriated corporate assets and altered corporate documents to disguise the misappropriations); *Levy v. Reiner*, 290 Ga. App. 471, 473-74 (2) (659 SE2d 848) (2008) (holding that a plaintiff could not maintain a direct action on a breach-of-fiduciary-duty claim against corporate directors and officers based on allegations that they paid themselves excessive salaries); *Haskins v. Haskins*, 278 Ga. App. 514, 520 (1) (629 SE2d 504) (2006) (holding that a plaintiff did not suffer a separate and distinct injury from other shareholders when, *inter alia*, his complaints applied "solely to the price of the stock" and "[m]isappropriation of corporate funds is primarily of a derivative nature"); *Matthews v. Tele-Sys., Inc.*, 240 Ga. App. 871, 872-74 (2) (525 SE2d 413) (1999) (holding that a breach-of-fiduciary duty claim, which essentially alleged that excessive salaries depleted or wasted corporate assets, could only be brought in a derivative action).

[59] As mentioned in Division 2 *supra*, even if the trustees' breach-of-fiduciary-duty claim regarding LOR's dividend-distribution policies is not time-barred because a new cause of action arose each time a distribution was made, the LOR Defendants are still entitled to summary judgment because they must bring that claim in a derivative action. Indeed, in *Rollins V*, the trustees acknowledged that Gary and Randall could not make "disparate dividends from LOR," and instead, they simply "slashed dividends from these corporate entities and engaged in transactions to divert income from these entities to other entities they control." *Rollins V*, 338 Ga. App. at 323 (3) (punctuation omitted). Thus, any actions taken to reduce LOR's dividend distributions injured all of its shareholders equally, including numerous Rollins family trusts other than the marital trust that are not parties to this litigation. While

43

trustees have not alleged a special injury that was not likewise suffered by the non-party shareholders, they are required to bring their claims in a derivative action unless they can show that reasons for the general rule requiring a derivative suit do not apply.[60]

Significantly, here, there are several LOR shareholders who are not a party to this litigation, but who could be prejudiced if damages are awarded to a single shareholder (*i.e.*, the marital trust), rather than to LOR.[61] And although the trial court found that all of the non-party shareholders have consented to and benefitted from the

---

the trial court erroneously found that the dividend-distribution claim was barred by *Rollins V* and did not address whether the claim was direct or derivative, we can affirm its grant of summary judgment if it is right for any reason, so long as the argument was advanced below. *See Serchion v. Capstone Partners, Inc.*, 298 Ga. App. 73, 76 (2) (679 SE2d 40) (2009) ("[W]e will affirm a [grant of] summary judgment if the court is right for any reason (assuming that reason was argued below) . . . ."). And in their motion for summary judgment, the LOR Defendants argued, *inter alia*, that all of the claims alleged in the complaint must be brought in a derivative action.

[60] *See supra* note 56 & accompanying text.

[61] *See Thomas v. Dickson*, 250 Ga. 772, 775 (301 SE2d 49) (1983) (explaining that if there is a possibility of prejudice to other interested parties, such as other shareholders, direct recovery should not be allowed); *Matthews*, 240 Ga. App. at 873 (2) ("If the corporation has creditors or other shareholders who would be prejudiced if the misappropriated funds were not returned to the corporation, then a direct action must fail.").

44

breaches of fiduciary duty alleged in the complaint, there is no evidence that, if the trustees' claims are successful, the non-party shareholders have consented to the resulting damages being paid only to the marital trust, rather than to LOR for the benefit of all the shareholders.[62]

Furthermore, a derivative suit is required here to prevent multiplicity of lawsuits. Even assuming that the non-party LOR shareholders would not, for whatever reason, separately sue Gary and Randall for the same misconduct alleged in this litigation, the trustees, who collectively represent the marital trust, have their own separate interest in LOR stock in their individual capacities. As previously mentioned, O. Wayne established an S-trust for the benefit of each of his nine grandchildren, including the trustees, and those S-trusts are LOR shareholders until each beneficiary reaches the age of 45, at which point the beneficiary becomes the shareholder. Thus, there is a risk that any one of the trustees, either individually or through their S-trust, could file another action asserting the same claims at issue here. And in fact, during her deposition, at least one of the trustees acknowledged her

---

[62] *See Levy*, 290 Ga. App. at 474 (2) (holding that, although the appellant contended that other shareholders were unlikely to bring additional claims because they benefitted from the alleged wrongful conduct, there was no evidence to support that assertion).

individual interest in LOR and was unable to say whether she would bring such claims in the future.[63]

In sum, the trial court erred in finding that any of the aforementioned breach-of-fiduciary-duty, mismanagement, or corporate-waste claims could be brought directly because the trustees have not alleged a special injury not suffered by the other non-party shareholders and the corporation, and because they cannot show that the reasons for requiring a derivative suit do not apply here.[64]

---

[63] *See Barnett*, 306 Ga. App. at 153-54 (3) (b) (holding that because all of corporation's shareholders were not parties to the lawsuit, risk of multiple lawsuits prohibited shareholder's direct action); *Sw. Health & Wellness, LLC. v. Work*, 282 Ga. App. 619, 626-27 (2) (c) (639 SE2d 570) (2006) (holding that the plaintiff shareholders must bring a derivative action when they alleged that the non-party shareholders were given the opportunity to participate in the lawsuit and chose not to, but there was no evidence to support that argument in the record, and thus, could not show that there was no danger of multiple lawsuits).

[64] *See McWhorter*, 312 Ga. App. at 816-17 (1) (holding that the plaintiff shareholders could not bring a direct action when *only one* of the reasons for requiring derivative actions applied, which was to protect corporate creditors); *Levy*, 290 Ga. App. at 474 (2) (holding that the plaintiff shareholders must bring a derivative action when *even one* of the reasons for requiring a derivative action applied, which was to prevent multiplicity of lawsuits); *Work*, 282 Ga. App. at 626-27 (2) (c) (same).

5. Given our holdings in Divisions 1 through 4 supra—*i.e.*, that all of the trustees' claims are either time-barred or derivative in nature, we need not address the LOR Defendants' remaining claims of error in its cross appeal.[65] For the same reason, we reverse the trial court's partial denial of their summary-judgment motion.

For all these reasons, we affirm the trial court's partial grant of summary judgment to the LOR Defendants in Case No. A18A0638 and reverse its partial denial of summary judgment to the LOR Defendants in Case No. A18A0668.

*Judgment affirmed in Case No. A18A0638 and reversed in Case No. A18A0668. Doyle, P. J., and Mercier, J., concur.*

---

[65] In their cross-appeal, the LOR Defendants' remaining claims of error are that the trial court erred in finding that (1) absent the time-bar, there were genuine questions of material fact regarding some of the trustees' breach-of-fiduciary-duty claims; (2) the trustees' damages theories were not too speculative to bar recovery; (3) the trustees' claims were not barred by a release that Ruth signed and that she would not be unjustly enriched if the trustees recovered on certain claims; and (4) in the absence of other defenses, there was a genuine question of material fact regarding the purchase and alleged improper use of LOR's assets.